**Ronald BRADLEY et al., Plaintiffs-Appellants,**

v.

**William G. MILLIKEN, Governor of Michigan, et al., Defendants-Appellees and Cross-Appellants,**

**Board of Education of the City of Detroit, Defendants-Appellees and Cross-Appellants,**

**Detroit Federation of Teachers, Intervening Defendant and Cross-Appellant.**

**Nos. 75–2018, 75–2295, 75–2296, 75–2443, 76–1635, 76–1678.**

United States Court of Appeals, Sixth Circuit.

Argued June 15, 1976.

Decided Aug. 4, 1976.

Certiorari Granted Nov. 15, 1976. See 97 S.Ct. 380.

Louis R. Lucas, Ratner, Sugarmon, Lucas & Salky, Memphis, Tenn., Thomas I. Atkins, Boston, Mass., John A. Dziamba, Williamantic, Conn., Nathaniel R. Jones, Gen. Counsel, NAACP, New York City, Elliot S. Hall, Detroit, Mich., Rose Mary C. Robinson, Sol Plafkin, Detroit, Mich. (for Leah Maddox and others), J. Harold Flannery, Paul R. Dimond, William E. Caldwell, Washington, D. C., for appellants in No. 75–2018.

Frank J. Kelley, Atty. Gen. of Mich., Gerald F. Young, Lansing, Mich., Charles E. Keller, Keller, Thoma, McManus, Toppin & Schwarze, Detroit, Mich., for Northville Public Schools and others.

John T. Shantz, Dell, Shantz, Booker & Schulte, Royal Oak, Mich., for Clarenceville School Dist. and others.

Donald J. Miller, Helm, Schumann & Miller, Detroit, Mich., for Huron School Dist.

John Wm. Thomas, Thomas & Delaney, Flint, Mich., for Holly Area Schools.

Douglas H. West, Hill, Lewis, Adams, Goodrich & Tait, Detroit, Mich., for Grosse Pointe Public Schools.

Kenneth McConnell, Hartman, Beier, Howlett, McConnell & Googasion, Bloomfield Hills, Mich., for School Dist. City Royal Oak.

William M. Saxton, Butzel, Long, Gust, Klein & Van Zile, Detroit, Mich., for Farmington Public Schools.

Raymond G. Glime, Glime, Daoust & Wilds, Mount Clemens, Mich., for Fraser Public Schools and Clintondale Romeo Community School.

Kenneth E. Scherer, Daner, Freeman, McKenzie & Matthews, Mount Clemens, Mich., for Utica Community School Anchor Bay.

William Ross, Ross, Bruff & Henriksen, Mount Clemens, Mich., for Personnel of Van Dyke.

Robert J. Lord, Fair Haven, Mich., for Kerry Green and others.

George Roumell, Jr., Riley & Roumell, Detroit, Mich., for Allison Green.

Jane Keller Souris, Thomas M. J. Hathaway, John F. Brady, Samuel E. McCargo, Theodore Sachs, Detroit, Mich., for Detroit Federation of Teachers.

Noel A. Gage, Mark E. Reizen, Gage, Brukoff, Dubin & Siudara, Southfield, Mich., for Latin Amer. for Social etc.

James K. Robinson, Detroit, Mich., for Coleman A. Young.

Theodore Sachs, Marston, Sachs, O'Connell, Nunn & Freid, Detroit, Mich., for appellants in No. 75–2295.

Frank J. Kelley, Atty. Gen. of Mich., Robert A. Derengoski, Gerald F. Young, George L. McCargar, Lansing, Mich., Louis R. Lu-

cas, Memphis, Tenn., Thomas I. Atkins, Boston, Mass., John A. Dziamba, Williamantic, Conn., Nathaniel R. Jones, Gen. Counsel, NAACP, New York City, for appellees in Nos. 75–2295, 75–2296 and 75–2443.

George T. Roumell, Jr., Detroit, Mich., for appellee Detroit Board.

George T. Roumell, Jr., Riley & Roumell, Detroit, Mich., for appellants in Nos. 75–2296, 75–2443.

Frank J. Kelley, Atty. Gen. of Mich., Robert A. Derengoski, Gerald F. Young, George L. McCargar, Lansing, Mich., for appellants in No. 76–1635.

Louis R. Lucas, Ratner, Sugarmon & Lucas, Memphis, Tenn., Thomas I. Atkins, Boston, Mass., John A. Diziamba, Williamantic, Conn., George T. Roumell, Jr., Riley & Roumell, Detroit, Mich., for appellees in No. 76–1635.

George T. Roumell, Jr., Riley & Roumell, Jane Keller Souris, Thomas M. J. Hathaway, Detroit, Mich., for appellant in No. 76–1678.

Louis R. Lucas, Ratner, Sugarmon, Lucas, Salky & Henderson, Memphis, Tenn., Frank J. Kelley, Atty. Gen. of Mich., Gerald F. Young, Lansing, Mich., Theodore Sachs, Marston, Sachs, O'Connell, Nunn & Freid, Detroit, Mich., Nathaniel R. Jones, Gen. Counsel, NAACP, New York City, Thomas I. Atkins, Boston, Mass., for appellees in No. 76–1678.

Before PHILLIPS, Chief Judge, and EDWARDS and PECK, Circuit Judges.

PHILLIPS, Chief Judge.

When this school desegregation case was filed in August 1970, Ronald Bradley, one of the black plaintiffs, had been assigned to enter the kindergarten of a Detroit school whose enrollment was 97 per cent black. There have been numerous court proceedings since that time, culminating in the opinion of the Supreme Court in *Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974), reversing the en banc

decision of this court reported at 484 F.2d 215 (1973). The Supreme Court remanded with directions for "prompt formulation of a decree directed to eliminating the segregation found to exist in Detroit city schools, a remedy which has been delayed since 1970." 418 U.S. at 753, 94 S.Ct. at 3131.

This court now reviews appeals and cross-appeals from various orders and decisions of the District Court, two of which are reported at 402 F.Supp. 1096 (1975) and 411 F.Supp. 943 (1975).

In September 1976 Ronald Bradley is scheduled to enter the sixth grade of the Clinton School, which now is more than 99 per cent black.[1] The decisions of the District Court which we now review do nothing to correct the racial composition of the Clinton School. They grant no relief to Ronald Bradley nor to the majority of the class of black students he represents.

Nevertheless, this court finds itself in the frustrating position of having to leave standing the results reached by the District Judge on the issue of assignment of students, although we disagree with parts of his opinions and orders. Our affirmance is found to be necessary for the simple reason that reversal would be an exercise in futility under the situation now existing in the Detroit school system and the law of this case as established by the Supreme Court in *Milliken v. Bradley*.

Other questions raised by the appeals of various parties will be discussed later in this opinion.

### I. Prior Findings as to Constitutional Violations

This litigation had its genesis under modest circumstances. On April 7, 1970, before the filing of any suit, the Detroit Board of Education on its own initiative adopted a plan to effect a more balanced distribution of black and white students in 12 of the 21 Detroit high schools. The April 7 plan was to take effect over a three-year period, applying initially to those students entering

---

1. The charts submitted by the Detroit Board show the Clinton School to be 100 per cent black.

the tenth grade in September, 1970. In the eleventh grade the plan was to have been effected at the opening of the 1971–72 school year and the twelfth grade at the beginning of the 1972–73 school year. The plan was designed to reduce segregation in a school system that then was 63.6 percent black.

On July 7, 1970, however, the Governor of Michigan signed into law Act No. 48, Public Acts of 1970. Section 12 of this Act had the effect of delaying and ultimately blocking the implementation of Detroit's April 7 plan. The four members of the Detroit Board of Education who supported the April 7 plan were removed from office through a recall election. Four new members were appointed by the Governor of Michigan. These four members, together with the incumbent members, who had opposed the April 7 plan from its inception, thereafter rescinded it.

The complaint in the present case was filed August 18, 1970. Among other things, the complaint prayed for a preliminary injunction requiring defendants to put into effect the plan adopted by the Detroit Board of Education on April 7 and restraining the defendants from giving any force or effect to § 12 of Act 48 insofar as it would inhibit immediate implementation of the April 7 plan. On September 3, 1970, the late District Judge Stephen J. Roth denied plaintiffs' application for a preliminary injunction. Plaintiffs immediately filed a notice of appeal and a motion in this case for injunction pending appeal.

On September 8, 1970, the day of the opening of the 1970–71 Detroit school term, the Chief Judge of the Sixth Circuit heard oral arguments on the application for an injunction to place the April 7 plan in effect pending appeal. The Chief Judge entered an order denying the application for injunction pending appeal and advanced the case on the docket of this court for argument on its merits. In an opinion announced October 13, 1970, reported at 6 Cir., 433 F.2d 897, this court held § 12 of Michigan Act 48 to be unconstitutional, ruled that the District Court did not abuse its discretion in denying the preliminary injunction and remanded the case for a trial on the merits. On remand, the District Court again refused to put the April 7 plan into effect. The plaintiffs moved for summary reversal or injunction pending appeal. In an opinion reported at 6 Cir., 438 F.2d 945 (1971), this court again remanded the case to the District Court for a hearing on the merits.

After extensive hearings, Judge Roth found as a fact that de jure segregation existed in the Detroit public schools. D.C., 338 F.Supp. 582 (1971). Included in his findings of fact were the following:

[W]e find that both the State of Michigan and the Detroit Board of Education have committed acts which have been causal factors in the segregated condition of the public schools of the City of Detroit. 338 F.Supp. at 592.

This court held that the foregoing findings of fact by Judge Roth were not clearly erroneous, Fed.R.Civ.P. 52(a), but to the contrary were supported by ample evidence. We said:

The discriminatory practices on the part of the Detroit School Board and the State of Michigan revealed by this record are significant, pervasive and causally related to the substantial amount of segregation found in the Detroit school system by the District Judge. 484 F.2d at 241.

The constitutional violations found to have been committed by the Detroit Board of Education are discussed in some detail at 484 F.2d 221–38. The constitutional violations found to have been committed by the State of Michigan are discussed at 484 F.2d 238–41.

We do not read the opinion of the Supreme Court as disagreeing with or disturbing in any way the findings of unlawful segregation with respect to the Detroit school system. To the contrary, as pointed out above, the Supreme Court remanded the case with a mandate for "prompt formulation of a decree directed to eliminating the segregation found to exist in Detroit city schools, a remedy that has been delayed since 1970." 418 U.S. at 753, 94 S.Ct. at 3131.

## II. The Remedy

It is the law of this case that both the State of Michigan and the Detroit Board of Education have committed acts which have been causal factors in creating the de jure segregation which exists in the public schools of Detroit. The principal question to be resolved on the present appeal involves the remedy. District Judge Stephen J. Roth died July 11, 1974. The responsibility for providing a remedy in obedience of the mandate of the Supreme Court was assigned to District Judge Robert E. De-Mascio, author of the opinions reported at D.C., 402 F.Supp. 1096 and D.C., 411 F.Supp. 943, which are involved on the present appeal.

### a) Previous Efforts to Effect a Remedy

After his finding of de jure segregation, Judge Roth grappled with the problem of fashioning a remedy in accordance with *Swann v. Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), *Monroe v. Board of Commissioners*, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968), *Green v. County School Board*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968) and *Brown v. Board of Education*, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). Initially he contemplated a "Detroit only" solution. A motion was made to add other school districts as parties defendant. Judge Roth reserved a decision on this motion pending submission and consideration of desegregation plans. 338 F.Supp. at 595.

Judge Roth required the school board defendants, Detroit and State, to develop and submit plans of desegregation, "designed to achieve the greatest possible degree of actual desegregation, taking into account the practicalities of the situation." Three "Detroit only" desegregation plans were submitted by the plaintiffs and by the Detroit Board of Education. Judge Roth found that:

[W]hile plaintiffs' plan would accomplish more desegregation than now obtains in the system, or which would be achieved under Plan A or C of the Detroit

Board of Education submissions, none of the plans would result in the desegregation of the public schools of the Detroit school district. . . . [R]elief of segregation in the Detroit public schools cannot be accomplished within the corporate geographical limits of the city. 345 F.Supp. at 916 (1972).

Judge Roth concluded that he had the duty to look beyond the limits of the Detroit school district for a solution to the illegal segregation in the Detroit public schools. 345 F.Supp. at 916.[2]

The parties submitted a number of plans of metropolitan desegregation, including six by the State Board of Education (made without recommendation), all of which were rejected. Judge Roth thereupon appointed a nine member panel "charged with the responsibility of preparing and submitting an effective desegregation plan." 345 F.Supp. at 916.

This was the posture of the decision of Judge Roth at the time four interlocutory orders were reviewed by the Court of Appeals under 28 U.S.C. § 1292(b), together with one final order relating to the purchase of school buses. No desegregation plan was ever adopted by Judge Roth or approved by this court.

As already noted, this court agreed with Judge Roth that the State of Michigan had committed acts of de jure segregation. In ruling on the interlocutory appeal, we also agreed that the State controls the instrumentalities whose action is necessary to remedy the harmful effect of the State acts, 484 F.2d at 245–49, and concluded:

In the instant case the only feasible desegregation plan involves the crossing of the boundary lines between the Detroit School District and adjacent or nearby school districts for the limited purpose of providing an effective desegregation plan. 484 F.2d at 249.

We said:

This court in considering this record finds it impossible to declare "clearly er-

2. The findings are quoted in full at 484 F.2d 242–45.

roneous" the District Judge's conclusion that any Detroit only desegregation plan will lead directly to a single segregated Detroit school district overwhelmingly black in all of its schools, surrounded by a ring of suburbs and suburban school districts overwhelmingly white in composition in a State in which the racial composition is 87 per cent white and 13 per cent black. 484 F.2d at 249.

This court held that it would be within the equity power of the District Court to adopt a plan of desegregation extending beyond the boundaries of the Detroit School District. We remanded the case to the District Court for the taking of additional evidence because several of the suburban school districts had not been heard or had an opportunity to be heard. We held that as a prerequisite to the implementation of a plan affecting any school district, "the affected district must be made a party to this litigation and afforded an opportunity to be heard." 484 F.2d 250–52.[3]

The Supreme Court reversed the decision of this court, holding that no remedy involving any school district other than Detroit would be within the equitable power of the District Court without evidence that the suburban district or districts had committed acts of de jure segregation. In his separate concurring opinion, Mr. Justice Stewart explained the grounds for reversal in this language:

3. The interlocutory decisions of Judge Roth, which were affirmed by this court, have been misunderstood and reported erroneously. It has been said that Judge Roth ordered, and this court approved, the consolidation of the Detroit School District with 53 suburban school districts, or that Judge Roth established a desegregation panel and ordered it to prepare a remedial plan consolidating the Detroit system and 53 suburban school districts. Such reports are incorrect. See, e. g., Hills v. Gautreaux, 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792, 44 U.S.L.W. at 4480 (1976). We have found nothing in any opinion or order of Judge Roth evidencing any intention to consolidate any school districts. He apparently contemplated a remedy which would have left the suburban districts intact but would have involved one or more of them in a metropolitan plan of pupil transportation.

Moreover, this court never indicated an intention to require the consolidation of any school districts. The interlocutory order affirmed by us merely created a panel "charged with the responsibility of preparing and submitting an effective desegregation plan." So far as the record shows, this panel never made a report. It is reemphasized that no specific plan of desegregation was ever adopted by Judge Roth or approved by this court.

Apparently there has been confusion between this case and Bradley v. School Board of the City of Richmond, 462 F.2d 1058 (4th Cir. 1972), aff'd by an equally divided court, 412 U.S. 92, 93 S.Ct. 1952, 36 L.Ed.2d 771 (1973), where the District Court ordered the consolidation of three separate Virginia school districts.

This court distinguished the Detroit case from the Richmond case in the following language:

Bradley v. School Board of the City of Richmond, 462 F.2d 1058 (4th Cir. 1972), aff'd by an equally divided court, 412 U.S. 92, 93 S.Ct. 1952, 36 L.Ed.2d 771 (1973), is distinguishable in several respects. In that case the District Court ordered an actual consolidation of three separate school districts, all of which the Court of Appeals for the Fourth Circuit declared to be unitary. In the instant case the District Court has not ordered consolidation of school districts, but directed a study of plans for the reassignment of pupils in school districts comprising the metropolitan area of Detroit. In the Richmond case the court found that neither the Constitution nor statutes of Virginia, previously or presently in effect, would have permitted the State Board of Education, acting alone, to have effected a consolidation of the three school districts into a single system under the control of a single school board. The Fourth Circuit held that compulsory consolidation of political subdivisions of the State of Virginia was beyond the power of a federal court because of the Tenth Amendment to the Constitution of the United States. The decisions which now are under review did not contemplate such a restructuring.

Furthermore, the court in the Richmond case cited provisions of the Constitution and statutes of Virginia in support of its holding that—

"The power to operate, maintain and supervise public schools in Virginia is, and always has been, within the exclusive jurisdiction of the local school boards and not within the jurisdiction of the State Board of Education." 462 F.2d at 1067.

The record in the present case amply supports the finding that the State of Michigan has not been subject to such limitations in its dealings with local school boards. 484 F.2d at 250–51.

In reversing the decision of the Court of Appeals this Court is in no way turning its back on the proscription of state-imposed segregation first voiced in *Brown v. Board of Education*, 347 U.S. 483 [74 S.Ct. 686, 98 L.Ed. 873], or on the delineation of remedial powers and duties most recently expressed in *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1 [91 S.Ct. 1267, 28 L.Ed.2d 554]. In *Swann* the Court addressed itself to the range of equitable remedies available to the courts to effectuate the desegregation mandated by *Brown* and its progeny, noting that the task in choosing appropriate relief is "to correct . . the condition that offends the Constitution," and that "the nature of the violation determines the scope of the remedy . . . ." *Id.* [402 U.S.] at 16 [91 S.Ct. at 1276].

The disposition of this case thus falls squarely under these principles. The only "condition that offends the Constitution" found by the District Court in this case is the existence of officially supported segregation in and among public schools in Detroit itself. There were no findings that the differing racial composition between schools in the city and in the outlying suburbs was caused by official activity of any sort. It follows that the decision to include in the desegregation plan pupils from school districts outside Detroit was not predicated upon any constitutional violation involving those school districts. By approving a remedy that would reach beyond the limits of the city of Detroit to correct a constitutional violation found to have occurred solely within that city the Court of Appeals thus went beyond the governing equitable principles established in this Court's decisions. 418 U.S. at 757, 94 S.Ct. 3112, 3133.

### b) The Remedy at Issue on Present Appeals

District Judge DeMascio was faced with an extremely difficult (if not impossible) assignment, confronted as he was with the responsibility of formulating a decree which would eliminate the unconstitutional segregation found to exist in the Detroit public schools, without transgressing the limits established by the Supreme Court.

Like Judge Roth, Judge DeMascio required the plaintiffs and the Detroit Board of Education to submit desegregation plans. Like Judge Roth, he rejected both plans as unsatisfactory. By his opinion of August 15, 1975, D.C., 402 F.Supp. 1096–1147, he outlined the details of this involved litigation, made findings of fact and adopted remedial guidelines. By his opinion of November 4, 1975, D.C., 411 F.Supp. 943, the District Judge adopted a desegregation plan drafted by the Detroit Board in accordance with the August 15 guidelines. Reference is made to these two opinions for a recitation of pertinent facts. Various amendatory and supplemental orders also have been entered by the District Court, which will be mentioned in this opinion only to the extent necessary to dispose of issues raised on this appeal.

The plaintiffs-appellants attack the plan as "bizarre" and urge its reversal. The Detroit Board of Education contends that the plan is constitutional and should be affirmed. The State defendants take the position that the pupil assignment plan meets constitutional requirements for desegregating the Detroit school system and should be affirmed, but contend that the District Court exceeded its authority in requiring certain "educational components" and in directing that the State pay 50 per cent of the cost of these programs.

The plan adopted by the District Court became effective as of the beginning of the winter-spring semester, 1976. As of September 26, 1975, the Detroit public schools enrolled 247,774 students, 75.1 per cent of whom were black. In broad outline the plan adopted by the District Court required the reassignment of 27,524 students, of whom 21,853 would require bus transportation. The plan changed the racial balance in 105 schools out of approximately 300 zoned schools in the system. Prior to the implementation of the plan, approximately

80 schools had enrollments of a majority of white students. Under the District Court's plan, 67 of these schools received black students through transportation and rezoning. The result of the student reassignments is that no school in Detroit, with two marginal exceptions, will have an enrollment of less than 30 per cent black students. Moreover, 47 of the previously white schools have become more than 40 per cent black.

In addition, 38 schools, the majority of which previously were at least 80 per cent black, received white students via transportation and rezoning. Under the plan, 25 of these schools became 45 to 55 per cent black. Furthermore, at least 23 of Detroit's schools, enrolling approximately 22,599 students, contain a substantial mix of black and white students without any student reassignment.

In order to effectuate the reassignment of students, the District Court ordered the purchase of 250 school buses.[4]

Finally, the District Court ordered the closing of certain antiquated schools, the establishment of vocational centers available on a non-racial basis to all qualifying students, and certain Educational Components, hereinafter discussed in further detail.

To the credit of the citizens of Detroit, the record discloses that the court's plan, although implemented in the middle of a school year, was accepted in an orderly manner and in a spirit of community cooperation, without substantial disruption or disorder.

Although some improvements have been accomplished by the District Court, the plan contains glaring defects that could never pass constitutional muster and would not be countenanced by this court in a different factual situation.

As of September 1974, prior to the implementation of the plan, the percentages of

black students in the eight school regions were as follows:

| Region | | % black |
|---|---|---|
| Region #1 | | 90.3% black |
| Region #2 | | 60.3% black |
| Region #3 | | 70.8% black |
| Region #4 | | 55.5% black |
| Region #5 | | 96.7% black |
| Region #6 | | 63.1% black |
| Region #7 | | 45.2% black |
| Region #8 | | 95.2% black |

402 F.Supp. at 1106.

Notwithstanding the reassignments effected by the District Court, the percentage of black students in each of the eight regions remains substantially unchanged under the adopted plan. Only twelve of the 157 zoned schools with previous enrollments over 90 percent black have become under 90 percent black. Approximately half of Detroit's schools remain more than 90 percent black. Moreover, the three regions which contain the highest concentration of black students, regions 1, 5 and 8, remain virtually untouched. This means that approximately 83,000 students are granted no relief from unconstitutional de jure segregation.

The Supreme Court has said that the existence of some one-race schools "is not in and of itself the mark of a system that still practices segregation by law." *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 26, 91 S.Ct. 1267, 1281, 28 L.Ed.2d 554 (1971). We recognize that the overwhelming number of black students in Detroit and their concentration in the inner city undoubtedly makes some one-race schools unavoidable under any "Detroit only" remedy. However, when the Detroit School Board virtually eliminated regions 1, 5 and 8 from both its initial plan and the plan finally adopted, it assumed the heavy burden of justifying its elimination of the schools located in these three regions. In *Swann* the Supreme Court stated:

---

4. In an order dated June 19, 1975, published at 6 Cir., 519 F.2d 679, *cert. denied,* 423 U.S. 930, 96 S.Ct. 280, 46 L.Ed.2d 258 (1975), this court modified and affirmed the order of the District Court requiring the purchase of 150 school buses. We directed that the Detroit School Board acquire the buses and that the State defendants bear the costs of acquisition to the extent of 75 per cent thereof. On October 8, 1975, the District Court ordered the Detroit Board of Education to acquire 100 additional buses, with 75 per cent of the costs to be paid by the State.

Where the school authority's proposed plan for conversion from a dual to a unitary system contemplates the continued existence of some schools that are all or predominantly of one race, they have the burden of showing that such school assignments are genuinely nondiscriminatory. The court should scrutinize such schools, and the burden upon the school authorities will be to satisfy the court that their racial composition is not the result of present or past discriminatory action on their part. 402 U.S. at 26, 91 S.Ct. at 1281.

The Board's burden of justification is particularly heavy in this case because the three regions which the Board has left untouched, in the inner city, are in the area most affected by the acts of de jure segregation of which both the Detroit and State defendants have been found guilty.

The records discloses no adequate justification for excluding regions 1, 5 and 8 from the plan. The principal testimony pertaining to the reasons for excluding the inner city from student reassignments came from Merle Henrickson, Director of Planning and Building Studies for the Detroit Board. Mr. Henrickson stated that the inner city "was beyond the limits of possible treatment." Exclusion of the inner city was necessary, in his view, in order to maintain "the racial mix of desegregated schools." The result of desegregating the inner city, he predicted, would be white flight.

■ The need for stability in a desegregation plan was emphasized by the Supreme Court in *Pasadena City Board of Education v. Spangler,* —— U.S. ——, 96 S.Ct. 2697, 49 L.Ed.2d —— (1976). Apprehension of white flight, however, cannot be used to deny basic relief from de jure segregation. As said by the Supreme Court in a slightly different context:

The primary argument made by the respondents in support of Chapter 31 is that the separation of the Scotland Neck schools from those of Halifax County was necessary to avoid "white flight" by Scotland Neck residents into private schools that would follow complete dismantling

of the dual school system. Supplemental affidavits were submitted to the Court of Appeals documenting the degree to which the system has undergone a loss of students since the unitary school plan took effect in the fall of 1970. But while this development may be cause for deep concern to the respondents, it cannot, as the Court of Appeals recognized, be accepted as a reason for achieving anything less than complete uprooting of the dual public school system. See *Monroe v. Board of Commissioners,* 391 U.S. 450, 459 [88 S.Ct. 1700, 1705, 20 L.Ed.2d 733]. *United States v. Scotland Neck Board of Education,* 407 U.S. 484, 490–91, 92 S.Ct. 2214, 2218, 33 L.Ed.2d 75 (1972).

■ The District Court did not subject the exclusion of these three regions to the close scrutiny required by *Swann.* The District Court merely noted:

Plaintiffs refuse to acknowledge that the racial composition of these three regions precludes their inclusion in a desegregation plan. . . . Clearly, it would be futile to attempt desegregation within the boundaries of these regions . . . .. 402 F.Supp. at 1129.

This perfunctory treatment of the inner city falls far short of the "root and branch" requirements of *Green v. County School Board,* 391 U.S. 430, 437–38, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), and the "all-out desegregation" requirements of *Keyes v. School District,* 413 U.S. 189, 214, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973).

In *Davis v. Board of School Commissioners of Mobile County,* 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971), Chief Justice Burger, speaking for a unanimous court, held that the eastern part of metropolitan Mobile cannot be treated "in isolation from the rest of the school system." 402 U.S. at 38, 91 S.Ct. at 1292. It seems equally unacceptable to treat Regions 1, 5 and 8 in isolation from the rest of the Detroit school system.

The Detroit Board of Education contends that the exclusion of Regions 1, 5 and 8 from the plan is supported by the decision

of the Supreme Court in *Pasadena City Board of Education v. Spangler,* —— U.S. ——, 96 S.Ct. 2697, 49 L.Ed.2d —— (1976). This contention is without merit. In the present case the plan adopted by the District Court, which we affirm in part, is the *first* remedy adopted in an effort to cure the effects of de jure segregation. We hold this remedy to be insufficient as to Regions 1, 5 and 8. This is not a *Spangler* situation. The Detroit Board also relies on *Washington v. Davis,* —— U.S. ——, ——, 96 S.Ct. 2040, 2041, 48 L.Ed.2d 597 (1976). We find this decision to be inapplicable here because it is the law of this case that unlawful de jure segregation, for which both the Detroit Board and State defendants are in part responsible, exists in the Detroit school system.

Even though we do not approve of that part of the District Court's plan which fails to take any action with respect to schools in Regions 1, 5 and 8, this court finds itself unable to give any direction to the District Court which would accomplish the desegregation of the Detroit school system in light of the realities of the present racial composition of Detroit. *Compare Calhoun v. Cook,* 522 F.2d 717 (5th Cir. 1975), *rehearing denied,* 525 F.2d 1203 (1975).

Plaintiffs urge that we reverse and require the District Court to adopt the plan proposed by them. The reasons stated by the District Judge for rejecting plaintiffs' plan are set forth at 402 F.Supp. 1123–25. The District Court found that this proposal would require transportation of 77,000 to 81,000 students and the purchase of approximately 840 school buses. Much of the transportation would be of black students from predominately black schools to other predominately black schools and the plan nevertheless would leave a majority of Detroit's students in schools 75 to 90 per cent black.

█ Our considered judgment is that plaintiffs' plan would accelerate the trend toward rendering all or nearly all of Detroit's schools so identifiably black as to represent universal school segregation within the city limits. The anticipated positive results, if any, would not justify the expense and hardship that inevitably would be involved. We agree with the District Judge that plaintiffs' plan would not satisfy the Supreme Court's mandate in this case.

A second alternative would be to reverse and order adoption of the plan originally proposed by the Detroit Board of Education. We have considered this alternative carefully and reject it because the plan originally proposed by the Board is not significantly different from the plan adopted by the court. Like the plan adopted by the court, the original Board proposal would have left Regions 1, 5 and 8 unaffected, with no changes in the allocation of students in the predominately black schools in those regions. The Board's original plan is based on the same erroneous theory as the plan adopted by the court—that the mere elimination of identifiably white schools satisfies the criteria of *Brown*.

The Board's proposal as originally suggested might have been preferable to the plan approved by the court. However, the Board now urges affirmance of the plan which it adopted pursuant to the District Court's guidelines. As pointed out above, this plan has been well received by the citizens of Detroit.

We conclude that the differences between the two plans are so inconsequential that the compulsory adoption of the Board's original plan by order of this court would produce more confusion than any possible good that would be accomplished.

A third alternative would be to reverse and direct that the District Court assign the white students now remaining in the Detroit school system among the predominately black schools on a percentage basis somewhat along the lines originally proposed by plaintiffs. It is obvious that such a requirement would accomplish nothing more than token integration, and that of uncertain duration.

█ Recognizing the absence of alternatives, we affirm the judgment of the District Court on the issue of assignment of students in areas other than Regions 1, 5

and 8. In affirming the District Judge's limited desegregation plan, we observe that the steps which he has taken thus far appear to us to be consistent with the fourteenth amendment, as interpreted by the Supreme Court in *Milliken v. Bradley,* 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974). We must, however, remand the case for further consideration in regard to the three central regions of the City of Detroit which both the school board and the District Judge excluded from their proposed remedial plans. We cannot hold that where unconstitutional segregation has been found, a plan can be permitted to stand which fails to deal with the three regions where the majority of the most identifiably black schools are located.

We recognize that it would be appropriate for us at this point to supply guidelines to the District Judge as to what he should do under this remand. Omission of such guidelines is not based on any failure to consider the problem in depth. It is based upon the conviction which this court had at the time of its en banc opinion in this case—and for the reasons carefully spelled out therein—that genuine constitutional desegregation can not be accomplished within the school district boundaries of the Detroit School District.

The record discloses that plaintiffs are proceeding with their efforts to establish the basis for a metropolitan remedy within the Supreme Court's guidelines in *Milliken v. Bradley.* See memorandum and order of District Court dated December 19, 1975, 411 F.Supp. 937. Our limited affirmance and remand in this case is without prejudice to the obligation of the District Court to proceed with that aspect of the litigation relating to the proposed metropolitan remedy.

On remand, the District Court will be empowered to make further alterations in the plan heretofore adopted by it, as the evidence may require, not inconsistent with this opinion. *Kelley v. Metropolitan City Board of Education,* 463 F.2d 732, 744–45 (6th Cir. 1972), *cert. denied,* 409 U.S. 1001, 93 S.Ct. 322, 34 L.Ed.2d 262 (1972).

### III. Educational Components

Citing the difficulties of the desegregation problems in Detroit, the District Court directed that the Detroit Board and the State put into effect certain comprehensive programs which were found to be essential to the success of the desegregation effort. The programs are referred to in the record as "Educational Components." They include: (1) establishment of vocational centers; (2) a comprehensive reading program; (3) an in-service training component designed to prepare faculty and other educational personnel to deal with new experiences that arise in a school system undergoing desegregation; (4) a testing component to insure that testing procedures are fair and equitable and have no discriminatory effects; (5) a uniform code of student conduct with provisions for due process hearings; (6) a program of school community relations; (7) a program of counseling and career guidance; and (8) a monitoring system to audit efforts to implement the court's desegregation efforts. Reference is made to those parts of the opinion of the District Court published at 402 F.Supp. 1138–45 dealing with these Educational Components. This opinion of the District Court has been supplemented by additional orders. The Detroit Board of Education was required to pay the highest amount previously allocated in its budget toward such programs. The remainder of the cost would be paid one-half by the State of Michigan and one-half by the Detroit Board of Education.

On May 11, 1976, the District Court entered a judgment implementing its program of Educational Components. This judgment included the following:

IT IS FURTHER ORDERED AND ADJUDGED that:

The defendant Detroit Board of Education and the state defendants shall, on or before the start of the September 1976 school term, institute comprehensive programs for:

a) Reading and communication skills

b) In-service training

c) Testing

d) Counselling and career guidance.

PROVIDED, HOWEVER, that the Detroit Board shall disclose to the state defendants its highest budget allocated in any year for each of these above-enumerated quality education programs ordered herein, and thereafter the state defendants and the Detroit Board shall compute the excess cost in addition thereto occasioned by the specific implementation of the court-ordered programs, and the state defendants and the Detroit Board shall thereafter equally bear the burdens of such excess cost imposed by the provisions contained in this judgment and previous orders directing implementation of said educational components consistent with all orders and memoranda relating thereto.

The Michigan State defendants appeal from the judgment of May 11, 1976, as to these four of the Educational Components, contending that there is no constitutional violation which justifies these remedies and that the District Judge exceeded his lawful authority by ordering the inclusion of these four Educational Components in the remedy in this cause. The Detroit Board of Education, on the other hand, contends that all the Educational Components are within the scope of the equity powers of the court to remedy racial segregation in the Detroit schools because they help to eliminate vestiges of discrimination and because they are a necessary part of the long-range desegregation plan.

■ The District Court found that these Educational Components are necessary "to remedy effects of past segregation, to assure a successful desegregation effort and to minimize the possibility of resegregation." 402 F.Supp. at 1118; May 11, 1976, order at page 3. This finding of fact is not clearly erroneous, but to the contrary is supported by ample evidence.

The need for in-service training of the educational staff and development of non-discriminatory testing is obvious. The former is needed to insure that the teachers and administrators will be able to work effectively in a desegregated environment.

The latter is needed to insure that students are not evaluated unequally because of built-in bias in the tests administered in formerly segregated schools.

We agree with the District Court that the reading and counseling programs are essential to the effort to combat the effects of segregation.

In *Brown v. Board of Education,* 347 U.S. 483, 494, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954), the Supreme Court said:

Such considerations apply with added force to children in grade and high schools. To separate them from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone. The effect of this separation on their educational opportunities was well stated by a finding in the Kansas case by a court which nevertheless felt compelled to rule against the Negro plaintiffs:

"Segregation of white and colored children in public schools has a detrimental effect upon the colored children. The impact is greater when it has the sanction of the law; for the policy of separating the races is usually interpreted as denoting the inferiority of the negro group. A sense of inferiority affects the motivation of a child to learn. Segregation with the sanction of law, therefore, has a tendency to [retard] the educational and mental development of negro children and to deprive them of some of the benefits they would receive in a racial[ly] integrated school system."

Without the reading and counseling components, black students might be deprived of the motivation and achievement levels which the desegregation remedy is designed to accomplish.

■ Accordingly, we conclude that the findings of the District Court as to the Educational Components are supported by the record. This is not a situation where the District Court "appears to have acted

solely according to its own notions of good educational policy unrelated to the demands of the Constitution." *See, Keyes v. School District,* 521 F.2d 465, 483 (10th Cir. 1975), *cert. denied,* 423 U.S. 1066, 96 S.Ct. 806, 46 L.Ed.2d 657, 44 U.S.L.W. 3399 (1976). We hold that the District Court acted within its equity powers in requiring the Educational Components as a part of the remedy. The decision of the District Court prescribing these components is affirmed. The matter of allocation of the costs of these components will be dealt with in part IV of this opinion.

## IV. The Allocation of Costs as Between the State of Michigan and The Detroit Board of Education

Both the State defendants and the Detroit Board appeal from the judgment of the District Court relative to the allocation of the costs of the Educational Components. The local Board also asserts that the State should bear all the cost of 100 additional school buses.

The State defendants assert that the District Court may not, consistent with the eleventh amendment, compel the State to pay for any part of the Educational Components. Reliance is placed upon *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

*Edelman* did not involve payment of State funds "as a necessary consequence of compliance in the future with a substantive federal-question determination" or payments which became due at a time when required by a "court-imposed obligation." At issue was a retroactive award of money relief which the Supreme Court found to be "in practical effect indistinguishable in many aspects from an award of damages against the State." 415 U.S. at 668, 94 S.Ct. at 1358. The Supreme Court recognized that under *Ex parte Young,* 209 U.S. 123, 150, 28 S.Ct. 441, 52 L.Ed. 714 (1908), expenditure of State funds may be required by a prospective court decree without violating the eleventh amendment, even if the relief has an ancillary effect on the State treasury.

Mr. Justice Rehnquist, speaking for the majority, said:

The injunction issued in *Ex parte Young* was not totally without effect on the State's revenues, since the state law which the Attorney General was enjoined from enforcing provided substantial monetary penalties against railroads which did not conform to its provisions. Later cases from this Court have authorized equitable relief which has probably had greater impact on state treasuries than did that awarded in *Ex parte Young.* In *Graham v. Richardson,* 403 U.S. 365, [91 S.Ct. 1848, 29 L.Ed.2d 534] (1971), Arizona and Pennsylvania welfare officials were prohibited from denying welfare benefits to otherwise qualified recipients who were aliens. In *Goldberg v. Kelly,* 397 U.S. 254, [90 S.Ct. 1011, 25 L.Ed.2d 287] (1970), New York City welfare officials were enjoined from following New York State procedures which authorized the termination of benefits paid to welfare recipients without prior hearing. But the fiscal consequences to state treasuries in these cases were the necessary result of compliance with decrees which by their terms were prospective in nature. State officials, in order to shape their official conduct to the mandate of the Court's decrees, would more likely have to spend money from the state treasury than if they had been left free to pursue their previous course of conduct. Such an ancillary effect on the state treasury is a permissible and often an inevitable consequence of the principle announced in *Ex parte Young, supra.* (Footnote omitted.) 415 U.S. at 667–68, 94 S.Ct. at 1357.

The majority opinion recognized that the eleventh amendment would not apply "where a federal court applies *Ex parte Young* to grant prospective declaratory and injunctive relief, as opposed to an order of retroactive payments . . . ." 415 U.S. at 666, n. 11, 94 S.Ct. at 1357.

In *Scheuer v. Rhodes,* 416 U.S. 232, 237, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974), the

Supreme Court, speaking through Chief Justice Burger, said:

> The Eleventh Amendment to the Constitution of the United States provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State . . .." It is well established that the Amendment bars suits not only against the State when it is the named party but also when it is the party in fact. *Edelman v. Jordan,* 415 U.S. 651 [94 S.Ct. 1347, 39 L.Ed.2d 662] (1974); *Poindexter v. Greenhow,* 114 U.S. 270, 287 [5 S.Ct. 903, 912, 29 L.Ed. 185] (1885); *Cunningham v. Macon & Brunswick R. Co.,* 109 U.S. 446 [3 S.Ct. 292, 27 L.Ed. 992] (1883). Its applicability "is to be determined not by the mere names of the titular parties but by the essential nature and effect of the proceeding, as it appears from the entire record." *Ex parte New York,* 256 U.S. 490, 500 [41 S.Ct. 588, 590, 65 L.Ed. 1057] (1921).
>
> However, since *Ex parte Young,* 209 U.S. 123 [28 S.Ct. 441, 52 L.Ed. 714] (1908), it has been settled that the Eleventh Amendment provides no shield for a state official confronted by a claim that he had deprived another of a federal right under the color of state law. *Ex parte Young* teaches that when a state officer acts under a state law in a manner violative of the Federal Constitution, he
>
>> "comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected *in his person* to the consequences of his individual conduct. The State has no power to impart to him any immunity from responsibility to the supreme authority of the United States." *Id.,* [209 U.S.] at 159–160 [28 S.Ct. 441, at 454]. (Emphasis supplied.) 416 U.S. at 237, 94 S.Ct. 1683, 1686.

In *Wright v. Houston Independent School District,* 393 F.Supp. 1149, 1158 (S.D.Tex. 1975), a school desegregation case, the court placed the following construction upon *Edelman* :

> The Supreme Court seems to be implying here that the situation is different if the state agency violates a judicially mandated standard of action. In *Edelman* the state agency failed to live up to the standards of a federal regulation, but invalidity of its actions had not yet been determined by a court of law. In the instant case, the Houston Independent School District has been ordered by the district court to conduct itself in a specified manner. It has not done so and this may have given rise to a violation of the rights of the plaintiffs herein with accompanying monetary damages. This difference in the circumstances may well make the case not subject to the *Edelman* decision.
>
> For these reasons the court has determined that the eleventh amendment does not bar a money judgment for the plaintiffs.

To like effect see *Morales v. Turman,* 383 F.Supp. 53, 59–60 (E.D.Tex.1974).

In *Cooper v. Aaron,* 358 U.S. 1, 4, 78 S.Ct. 1401, 1403, 3 L.Ed.2d 5 (1958), the Supreme Court said:

> As this case reaches us it raises questions of the highest importance to the maintenance of our federal system of government. It necessarily involves a claim by the Governor and Legislature of a State that there is no duty on state officials to obey federal court orders resting on this Court's considered interpretation of the United States Constitution. Specifically it involves actions by the Governor and Legislature of Arkansas upon the premise that they are not bound by our holding in *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873.
>
> \* \* \* \* \* \*
>
> The principles announced in that decision and the obedience of the States to them, according to the command of the Constitution, are indispensable for the protection of the freedom guaranteed by our fundamental charter for all of us.

Our constitutional ideal of equal justice under law is thus made a living truth.

In *United States v. Board of School Commissioners of Indianapolis,* 503 F.2d 68, 80, 82 (7th Cir. 1974), *cert. denied,* 421 U.S. 929, 95 S.Ct. 1654, 44 L.Ed.2d 86 (1975), the Seventh Circuit found an affirmative duty on Indiana state officials to assist in desegregating the Indianapolis school system. The court said: "The Eleventh Amendment does not prevent enforcement of the Fourteenth Amendment." 503 F.2d at 82.

In *Bradley v. Milliken,* 484 F.2d at 258, this court said:

> In the exercise of its equity powers, a District Court may order that public funds be expended, particularly when such an expenditure is necessary to meet the minimum requirements mandated by the Constitution. *Griffin v. County School Board of Prince Edward County,* 377 U.S. 218, 233, 84 S.Ct. 1226, 12 L.Ed. 256 (1964); *Eaton v. New Hanover County Board of Education,* 459 F.2d 684 (4th Cir. 1972); *Brewer v. School Board of City of Norfolk,* 456 F.2d 943, 947, 948 (4th Cir.), cert. denied, 406 U.S. 933, 92 S.Ct. 1778, 32 L.Ed.2d 136 (1972); *Plaquemines Parish School Board v. United States,* 415 F.2d 817 (5th Cir. 1969).

The opinion of the Supreme Court reversing our decision in *Bradley* did not deal with this subject.

*Wyatt v. Aderholt,* 503 F.2d 1305, 1314–15 (5th Cir. 1974), involved an Alabama state school designed to rehabilitate the mentally retarded which was not being operated in a constitutional manner. The State defendants in that case, the Governor, the Alabama Commissioner of Mental Health and the Alabama Mental Health Board, like the State defendants in the present case, asserted that the federal court could not enter a judgment requiring the expenditure of State funds. Judge Wisdom responded to this contention as follows:

> The appellants' fourth contention is that the order of the district court invades a province of decision-making exclusively reserved for the state legislature. Governor Wallace argues that the

order will require heavy expenditures of state funds; that these funds will have to come from other state programs; and that the duty of compromising and allocating funds among the many programs competing for them is a duty which must be discharged by the state governor and legislature alone. Governor Wallace concedes in his brief that he is not contending that "the financial cost of complying with an established constitutional right is a valid reason for failure to comply". He "suggest[s] that before the Court decides to adopt a new constitutional right it should consider all of the consequences of its action, financial and social, and its effect on our federal form of government". The Mental Health Board makes the point in a related way, by suggesting that the district court's order here is in effect an order requiring the state to furnish a particular service, and by citing cases establishing the general proposition that ordinarily it is not for the federal courts to say whether or in what amounts a state shall provide any particular governmental benefit or service. *E. g., Fullington v. Shea,* D.Colo.1970, 320 F.Supp. 500, aff'd, 404 U.S. 963, 92 S.Ct. 345, 30 L.Ed.2d 282.

We find these arguments unpersuasive. It goes without saying that state legislatures are ordinarily free to choose among various social services competing for legislative attention and state funds. But that does not mean that a state legislature is free, for budgetary or any other reasons, to provide a social service in a manner which will result in the denial of individuals' constitutional rights. And it is the essence of our holding, here and in *Donaldson,* that the provision of treatment to those the state has involuntarily confined in mental hospitals is necessary to make the state's actions in confining and continuing to confine those individuals constitutional. That being the case, the state may not fail to provide treatment for budgetary reasons alone. "Humane considerations and constitutional requirements are not, in this day, to be

measured or limited by dollar considerations". *Jackson v. Bishop,* 8 Cir. 1968, 404 F.2d 571, 580 (Blackmun, J.), quoted, *Rozecki v. Gaughan,* 1 Cir. 1972, 459 F.2d 6, 8. "Inadequate resources can never be an adequate justification for the state's depriving any person of his constitutional rights". *Hamilton v. Love,* E.D.Ark.1972, 328 F.Supp. 1182, 1194. "[T]he obligation of the Respondents [prison officials] to eliminate unconstitutionalities does not depend upon what the Legislatures may do". *Holt v. Sarver,* E.D.Ark.1970, 309 F.Supp. 362, 385, aff'd, 8 Cir. 1971, 442 F.2d 304. See also *Hawkins v. Town of Shaw,* 5 Cir. 1971, 437 F.2d 1286, 1292. 503 F.2d at 1314–15.

■ The decision of the District Court in the present case imposes no money judgment on the State of Michigan for past de jure segregation practices. Rather, the order is directed toward the State defendants as a part of a prospective plan to comply with a constitutional requirement to eradicate all vestiges of de jure segregation. *Alexander v. Holmes County Board of Education,* 396 U.S. 19, 20, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969).

The eleventh amendment contention of the State defendants is without merit.

We hold that it is within the equitable powers of the court to require the State of Michigan to pay a reasonable part of the cost of correcting the effects of de jure segregation which State officials, including the Legislature, have helped to create. We reemphasize that it is the law of this case that the State of Michigan has been guilty of acts which have a causal relation to the de jure segregation that exists in Detroit. *See* 484 F.2d at 238–41.

The State defendants have stipulated and agreed to an equal sharing of the costs of the acquisition and construction of the area vocational centers. This court has required the State defendants to bear 75 per cent of the costs of acquiring 150 school buses. 6 Cir., 519 F.2d 679 (1975), *cert. denied,* 423 U.S. 930, 96 S.Ct. 280, 46 L.Ed.2d 258 (1975). The District Court ordered that the cost of acquiring 100 additional school buses be shared on the same basis: i. e., that the buses be purchased by the Detroit Board, with the State bearing 75 per cent of the costs.

On May 11, 1976, the District Court ordered that the State and Detroit Board each pay one-half the cósts of the Educational Components. Both the State defendants and Detroit Board appeal from this order. The State defendants contend that the State should not be required to pay any of the cost of these programs other than the normal share of State school aid funds provided to Detroit. The Detroit Board contends that any requirement that it bear the major financial responsibility for the plan does not result in "balancing the individual and collective interests" as required by *Swann,* 402 U.S. at 16. The Detroit Board asserts that this court should modify the order of the District Court so as to require the State defendants to pay at least 75 per cent of the total costs of the desegregation plan and 100 per cent of the costs of 100 additional school buses.

■ Since Michigan State officers and agencies were guilty of acts which contributed substantially to the unlawful de jure segregation that exists in Detroit, the State has an obligation not only to eliminate the unlawful segregation but also to insure that there is no diminution in the quality of education. This principle was stated in *Hart v. Community School of Brooklyn,* 383 F.Supp. 699 (E.D.N.Y.1974), *aff'd,* 512 F.2d 37 (2d Cir. 1975), wherein the court described the State's responsibility in a desegregation plan as follows:

As part of the State's obligation to eliminate segregation, there is, of course, a concomitant obligation to ensure that there is no diminution in the quality of education . . ." 383 F.Supp. at 741.

In *Evans v. Buchanan,* 379 F.Supp. 1218 (D.Del.1974), *aff'd* 423 U.S. 963, 96 S.Ct. 381, 46 L.Ed.2d 293 (1975), *reh. denied,* 423 U.S. 1080, 96 S.Ct. 868, 47 L.Ed.2d 91 (1976), the court said:

Accordingly, it is well established that to the extent that any schools in the State

are in violation of Brown and its progeny or of this Court's orders, the State Board must bear primary responsibility." 379 F.Supp. at 1222.

■ The fiscal justification for the decision of the District Court in requiring that the State of Michigan pay one-half of the costs of the desegregation plan (to the extent specified in the orders and judgments) is supported abundantly by the evidence with respect to the critical financial problems now confronting the Detroit Board of Education. The Board is operating on a "survival budget". The evidence is summarized in the brief of the Detroit Board, excerpts from which are set forth in the Appendix to this opinion.

We see no reason at this time for upsetting the judgment that the State of Michigan pay 50 percent of the costs of the desegregation plan to the extent prescribed by the District Court. We recognize, however, that it will be difficult for the Detroit Board to pay its share of the costs. (See Appendix.) Our affirmance of the District Court on this issue is not intended as a mandate for a cutback in essential educational programs in order to meet the expenses of implementing the desegregation plan. We affirm that part of the judgment relating to the costs of the plan, but without prejudice to the right of the District Court to require a larger proportionate payment by the State of Michigan if found to be required by future developments.

Our previous order requiring the State to bear 75 per cent of the cost of 150 school buses is reaffirmed. The order of the District Court requiring the State to bear 75 per cent of the cost of the 100 additional school buses is affirmed.

### V. Faculty Desegregation

Originally Judge DeMascio declined to order any reassignment of faculty in response to a proposal by the Detroit School Board that each Detroit school should have a teaching staff half white and half black.

On August 28, 1975, however, the District Court entered the following order:

Pursuant to this court's Memorandum Opinion and order dated August 15, 1975, this court's Supplemental Memorandum and Order dated August 18, 1975, and this court's Order dated August 26, 1975;

IT IS HEREBY ORDERED that incidental to and concurrently with the implementation of the plan of student desegregation as hereafter ordered by the court, teachers in the Detroit School System shall be reassigned insofar as necessary, and subject to collective bargaining agreement provisions otherwise applicable and not inconsistent with this order, to achieve a distribution of not more than 70% of teachers of one race in each school.

The Detroit Federation of Teachers, Intervenors, and the Detroit Board appeal from this order, taking diametrically opposite positions. The teachers contend that it is the law of the case, under findings of fact by both Judge Roth and Judge DeMascio, that there has been no racially discriminatory assignment of Detroit faculty and that there is no lawful predicate for any faculty reassignment order based on race. The Board contends that the court erred in rejecting a 50–50 ratio proposed in the original Board plan. It is asserted that adherence to the District Court's 70 per cent figure has caused the Board to be out of compliance with 45 C.F.R. § 185.44(d)(3), thus preventing the Detroit school system from receiving funds under the Emergency School Aid Act, 20 U.S.C. § 1602 (Supp. II, 1972).[5]

Additionally, the Detroit Board contends that the District Court erroneously ruled as inadmissible: (1) testimony that the balance of staff provisions of the collective bargaining agreement have not brought about the anticipated racial ratios of teachers in individual schools; (2) testimony that teacher transfers were necessary when students

---

5. The Emergency School Act makes no distinction between de jure and de facto segregation. 20 U.S.C. § 1602(b).

were reassigned, grade structures changed and schools closed; and (3) testimony that the racial ratio of teachers must be changed in order to qualify for federal funds.

The State defendants support the position of the teachers. The plaintiffs support the position of the Board.

▪ We reject the contention of the intervenors that the order of Judge Roth, entered in 1971, deprives the Board of Education or the court of power to reassign teachers in 1976. *Cf., Swann*, 402 U.S. 1, 16, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Keyes v. School District*, 521 F.2d 465, 484 (10th Cir. 1975), *cert. denied*, 423 U.S. 1066, 96 S.Ct. 806, 46 L.Ed.2d 657 (1976); *see also, Morgan v. Kerrigan*, 509 F.2d 580, 595 (1st Cir. 1974), *aff'g*, 379 F.Supp. 410 (D.Mass. 1974), *cert. denied*, 421 U.S. 963, 95 S.Ct. (1975).

It is significant that Judge Roth's order of June 14, 1972 (dealing with a contemplated metropolitan remedy), 345 F.Supp. 914, 931, 938, made provisions for reassignment of faculty.

The reassignment of faculty is similar to the reading and counseling "Educational Components" which we have upheld in Part III of this opinion. It helps to mitigate the fact that the majority of Detroit's children are left in schools that are overwhelmingly one race. Reassignment of faculty serves to provide these children with the maximum desegregative experience possible under the circumstances.

[11] In fashioning a desegregation remedy which involves reassignment of faculty it is obvious that, if otherwise feasible, a District Court should leave a school system in compliance with applicable federal regulations. We express no views in this opinion as to whether the above quoted August 28 order of the District Court disqualifies the Detroit school system from receiving aid.[6] This question is not before us.

▪ Although the District Court has the authority as an equitable remedy to order the reassignment of faculty, we conclude that further consideration should be given to this issue. Accordingly, we vacate the above-quoted order of the District Court, dated August 28, 1975, and remand this aspect of the case to the District Court for the hearing of the evidence on the issue of faculty assignment.

## VI. Conclusion

The case is remanded to the District Court for further proceedings not inconsistent with this opinion. No costs are taxed. Each party will bear his own costs on this appeal.

## APPENDIX

Financially, the Detroit school system has been devastated by a series of compounding economic crises. The period between 1970 and 1976 has marked an all-time low in the system's ability to absorb and compensate for the costs of educating Detroit's children.

The cost of education is a function of the size of a school district. (TR. Vol. 7 at 110–111). The Detroit system is the largest school district in the State and encompasses the largest number of indigent students in Michigan. (TR. Vol. 25 at 88). The cost of providing educational services in Detroit has gone up disproportionately to the continuing above-state average drop in school enrollment. (TR. Vol. 24 at 131). This cost increase reflects the additional cost of doing business, without improving educational services. (TR. Vol. 24 at 125–126; Vol. 7 at 85–86).

Actually, since 1971, the Detroit school system has experienced severe financial crisis as a result of the loss of property tax revenues by virtue of urban renewal and highway construction; the exodus of business and industries to the suburbs and the concomitant outward population flow from the city. (TR. Vol. 7 at 92). At the same time, the system was experiencing escalating educational costs forcing the Board into a "survival" budget under which the system was forced to provide only minimal educational services while eliminating many crucial educational programs.

6. See 42 U.S.C. § 2000d–5 (1970).

By 1973, the system had accumulated a 68 million dollar deficit and was within four days of closing its doors due to the lack of funds. (TR. Vol. 7 at 82). As a result of special state legislation, the Detroit system was able to finance its debt over a period of years and continue operations utilizing a portion of the operating budget for repayment. However, by law the Detroit Board was required to operate within a balanced budget which has necessitated a continuation of the "survival" budget instituted in 1971.

The Detroit school system is financed by property taxes as allocated by the Wayne County Tax Allocation Board and as voted by the electors of the school district, by declining State Aid supplied by the state legislature based upon the number of students in the school district and the State Equalized Value (SEV) of property in the district and by special funds from the Michigan legislature and from federal sources. (TR. Vol. 7 at 87–90, 93, 95, 105; Vol. 25 at 106–107; Detroit Board Ex. 42 and 43). State Aid comprised approximately 47% of the total 1974–75 budget and federal funding provided approximately 15% of that budget. The Detroit Board does not have the power nor the authority to levy an income tax to finance school operations, nor can the Board levy additional millage without a favorable vote of the electorate. (TR. Vol. 7 at 86; Vol. 24 at 151, 157; Vol. 26 at 20).

Detroit's municipal tax overburden is a function of its size and the result of the many municipal services provided by Detroit which are not provided or required by other municipalities but which are utilized by citizens of the entire southeastern Michigan area.

Over the past five years, Detroit's SEV has remained relatively static compared to the increasing SEV of the rest of the State. The School Aid Act provides a power equalizing formula to supply a more uniform flow of State revenue to school districts to remedy the widely variant per pupil SEV. The per capita SEV in Detroit is 50% lower than the average for the 20 largest cities in Michigan, thus requiring more millage to be levied by Detroit taxpayers to obtain an equal yield. (TR. Vol. 7 at 105; Detroit Board Ex. 31).

The municipal overburden inequities have been recognized by the State and school aid is supplied school districts whose municipal overburden is in excess of 125% of the state average. [Bursley Act, M.C.L.A. § 388.-1225; M.S.A. § 15.1919(525)]. While the power equalizing membership section of the Act, in which all qualifying school districts can share, is fully funded, the municipal overburden section of the Act is presently funded by only approximately 28% of the total amount authorized. Detroit, with the greatest overburden in the State, presently receives 91% of the allocated funds in the overburden section of the Act pursuant to the formula.

If the overburden section were fully funded, the Detroit system would receive an additional 61.6 million dollars. If it were funded by 50% (as was done in 1972–73), the system would receive an additional 18.7 million dollars more than is presently received. It is clear that the State does not provide the Detroit Board with all the money in State aid which it should or could.

On July 1, 1975, the Central Board of Education adopted a 1975–76 general fund-general purpose budget in the amount of $310,231,253. The budget as adopted was a balanced budget based upon projected revenue and anticipated expenditures. However, total anticipated revenues from state, local and federal sources were short of meeting expenditure requirements by $4,691,496. In order to balance the budget at $310,231,253 an allocation of $4,691,496 was required from prior year general fund equity to close the gap between revenues and expenditures.

The 1975–76 budget is essentially a continuation of the inadequate level of educational services of the past several years. In January, the Detroit Board cut close to $17 million from its budget for the second half of the school year. Annualized, this cut amounted to about $34 million. At the time, this was close to 15% of the Board's

general purpose budget. In addition, emergency cuts of $10.7 million were instituted during the 1973–74 school year. Annualized savings from these said year cuts are about $20 million. Detroit has not been able to restore the programs and services eliminated or curtailed as a result of these further budget cuts.

Expenditures have been reduced and postponed each year since 1971. The cumulative effects of past cutbacks have already begun to have serious consequences for educational programs. Continuing these cuts merely compounds the damage. Each year it becomes more costly to restore these services because of the inflationary spiral. For those students who have left the system, it is already too late to have any effect regardless of cost.

Subsequent to adoption of the 1975–76 budget, state aid revenue which had been originally estimated at $159,318,160 were reduced to $152,467,601 as a result of decreases in the municipal overburden allocation to Detroit, a .6% statutory reduction, a 1.7% executive order reduction, and various other state aid adjustments. In order to maintain school programs and services, the $6,850,559 reduction in state aid was replaced from prior year general fund equity.

In addition, a number of supplemental budget allocations were required in 1975–76 to meet mandatory operating costs in such areas as transportation, bilingual/bicultural programs and building operation and maintenance. Based upon the total supplemental appropriations and replacement of state aid revenue losses, the Detroit school district faces a potential budgetary deficit of approximately $5,700,000 in 1975–76. The general fund equity accumulated from prior years will be completely exhausted.

Estimated general fund-general purpose expenditure requirements for 1976–77 are approximately $336 million.[1] This estimated level of expenditure reflects only the increased cost of doing business in 1976–77 at the same level of services as 1975–76.

The increases in cost are of a nondiscretionary nature and include negotiated salary adjustments and increments of $20,000,000, inflationary increases of $4,500,000, and a contingency for unanticipated charges equal to 1% of the total budget or $3,360,-000. Except for those desegregation components implemented this year, i. e., pupil transportation and bilingual/bicultural, no provision has been made for desegregation costs.

With regard to projected reserve, there is a potential gap of over $37 million between estimated 1976–77 expenditure requirements and current year reserve estimates. This gap will have to be closed by reducing the projected level of expenditure through an additional cutback in educational programs and services and/or increasing revenues. If additional revenues are not obtained from local or state sources, existing programs and services would have to be cut by up to $37 million to balance the 1976–77 budget. If a deficit is incurred in 1975–76, that amount would also have to be included as part of the budget cuts required in 1976–77.

At least three state aid bills are currently before the legislature. It is unlikely that the state will fund any appreciable increase in state aid for 1976–77. Consequently, at best, state revenues for next year will be at the same level as in 1975–76.

The record reflects, and the District Court so found, that there is no possibility of the citizens of Detroit voting additional millage for operation of the school system in the near future. Detroit taxpayers shoulder the highest tax burden in the State. (TR. Vol. 24 at 146–147; Detroit Board Ex. 30, 41). Additionally, Detroit taxpayers have the highest municipal tax overburden in Michigan. (TR. Vol. 7 at 104, 109–114; Vol. 24 at 147; Detroit Board Ex. 33). Detroiters pay a 28.58% higher property tax rate than the State average. (TR. Vol. 24 at 146; Detroit Board Ex. 41). Of the past eight millage elections for additional revenue, seven have failed and a rea-

1. This compares with 310.2 million dollars in 1975–1976. There will be no general fund equity to supplement any increases.

sonable expectation is that no additional millage will be voted in the near future. (TR. Vol. 24 at 143–144, 147, 150–151; Vol. 7 at 140, 144; Detroit Board Ex. 40).

Notwithstanding this dismal prediction by the District Court, the Detroit Board plans to place a millage proposal before the electorate of the City of Detroit for a 3 mill tax to maintain existing programs and a 2 mill tax for modest improvements (App. at 35a) in a desperate attempt to increase revenues for the 1976–77 school year. This millage proposal was preceded by a recent vote of the electorate which increased taxes to finance a court ordered construction of a new jail facility. Again, the immediate tax burden of Detroit residents has been increased, and the Detroit Board's request must follow closely on the heels of this recent tax burden increase. Additionally, the legislature and the City Council have just voted a 3 mill garbage tax. Similarly, City of Detroit property owners will pay a 2–2.5 mill tax increase for City debt retirement (App. at 35a).

In light of all the above, the financial impact of implementing the District Court's adopted desegregation plan is readily apparent upon a cursory review of the relevant orders of the District Court between August 15, 1975, and May 11, 1976.

On August 15, 1975, the District Court (App. at 1a–15a) ordered, exclusive of transportation costs, the establishment of four vocational centers; formulation of two additional technical high schools patterned after Cass Tech; institution of comprehensive programs for a) in-service training, b) bi-lingual/multi-ethnic studies, c) counseling and career guidance, d) testing, and e) co-curricular activities; equalization of all school facilities and buildings; and comprehensive construction and restoration programs.

On October 29, 1975 (App. at 16a–19a), the District Court ordered the Detroit Board to devise an in-service training program for all school personnel to provide instruction in the "fair, non-discriminatory" administration of the Student Code of Conduct; and an in-service training program for the reading program.

Later, on November 10, 1975 (App. at 20a–22a), the District Court ordered the Detroit Board and the State Defendants to jointly identify and acquire suitable sites for five vocational centers and take steps to construct such sites as soon as possible; and the in-service training of reading instructors.

On December 4, 1975 (App. at 25a–26a), the District Court ordered implementation of the Detroit Board's October 8, 1975, proposal for a reading instruction program, including in-service training of all instructors.

On January 14, 1976 (App. at 27a–29a), the District Court ordered the institution of the Detroit Board's Modernization Program.

Finally, on May 11, 1976 (App. at 30a–34a), the District Court ordered equalization of all school facilities and buildings preparatory to the 1976–77 school term; continuance of the comprehensive construction and renovation program; the institution of a reading and communication skills program, together with the necessary in-service training therefore; the institution of the testing program with the accompanying in-service training; institution of the counseling and career guidance program with the accompanying in-service training; the application of a formula for equal sharing of excess cost of implementing the educational components by the Detroit Board and the State Defendants; institution of the vocational education program; institution of a comprehensive program for bi-lingual/multi-ethnic studies; and institution of the in-service training program for implementation of the Uniform Code of Conduct.

Even without actual dollar figures, the financial impact of these orders could easily destroy the educational program of the Detroit school system. The financing of these components by the Detroit school system would only mean a concomitant elimination of existing programs.

It is virtually impossible for the Detroit Board of Education to re-order its priorities when it is already operating on a woefully inadequate budget that cannot provide a minimal quality educational program. Any attempt to redistribute available resources will cause further deterioration in on-going educational programs and will merely result in robbing Peter to pay Paul.

Nevertheless, the school district is required by law to adopt a balanced budget by July 1. In order to do so, expenditure requirements will have to be reduced to the level of expected revenue. This will mean a drastic cut in existing programs and services. The school district will not even be able to maintain current levels of educational programming; therefore, it would certainly be a futile gesture to consider funding the increased costs of implementing desegregation components.

The May 11, 1976, Judgment appealed presents a highly structured and effective desegregation plan. However, the Judgment fails to establish a satisfactory financing scheme to properly and equitably dispense the costs of underwriting such a plan.