Ronald BRADLEY et al., Plaintiffs,

v.

William G. MILLIKEN, Governor of the State of Michigan, et al., Defendants.

Civil No. 35257.

United States District Court, E. D. Michigan, S. D.

Nov. 4, 1975.

Louis R. Lucas, Ratner, Sugarmon & Lucas, Memphis, Tenn., Thomas Atkins, Boston, Mass., for plaintiffs.

George T. Roumell, Jr., Riley & Roumell, Detroit, Mich., Theodore Sachs, Marston, Sachs, O'Connell, Nunn & Freid, Detroit, Mich., George L. McCargar, Jr., Asst. Atty. Gen., Lansing, Mich., for defendants.

## MEMORANDUM AND ORDER

DeMASCIO, District Judge:

At the inception of the remedial phase of this litigation, the court directed the parties to submit plans to effectively establish a unitary school system. After affording the parties approximately 30 days to attempt to resolve their differences, the court conducted extensive

hearings on the plans submitted.[1] The parties were persistent in their different views of what constituted desegregation. The plaintiffs adhered steadfastly to the view that desegregation required that the racial composition of every school in the system conform to within 15% of the system-wide racial ratio, that other considerations furthering integration were not relevant toward the formulation of a desegregation plan, and that existing practicalities at hand were not relevant. The defendant Detroit Board of Education contended that a just and feasible plan must give consideration to the "practicalities of the situation" such as the racial ratio existing in the school community, which is predominantly black by wide margins, shifting population trends and demography, the financial plight of the school district, the need for school, neighborhood and community stability, and assurances that the district be able to provide optimal educational opportunities for all children, and that an effective desegregation plan should not look merely to the present, but should desegregate "now and hereafter" by preventing resegregation.

Upon completion of the hearings, the court carefully examined the plans together with all the evidence submitted. We concluded that both plans were too rigidly structured because of adherence to fixed racial ratios (which was found to be not only undesirable but constitutionally infirm), that both plans failed to properly weight the essential "practicalities of the situation", that neither plan exhausted alternatives in light of such practicalities, and that neither plan appropriately balanced the equitable burdens with the desegregative results achieved. On August 26, 1975, we directed the defendant Detroit Board to prepare a revised plan, which was submitted on September 19, 1975. On October 8, 1975, we directed the Detroit Board to re-evaluate various aspects of

its September 19, 1975 plan, and the Board again submitted a revision on October 21, 1975.

Thus, this is the third occasion the court has had to carefully examine every detail of the Detroit Board's desegregation plan. The sole purpose of our detailed examination has been to devise a "just, feasible and equitable" desegregation plan pursuant to a United States Supreme Court mandate that we formulate a "decree directed to eliminating the segregation found to exist in the Detroit city schools. . . . " We have found that the revised plan closely parallels the court's guidelines. There are instances in which the Detroit Board employs parameters at variance with the guidelines, but we have said that the Detroit Board may do so, provided the plan itself discloses that the additional effort will have a salutary affect upon desegregation (Memorandum Opinion, August 15, 1975, p. 121), since a cooperative board should be afforded discretion to weigh the practicalities at hand. This does not mean, however, that the Detroit Board is free to charter a course beyond the guidelines to accommodate individual philosophies or regional goals. We have been careful to ensure that where the plan exceeds the court's guidelines, the plan discloses the practicalities considered and the reasons for affording varying weight to those practicalities.

We are satisfied that the revised plan, which we today order implemented with some modifications made by the court,[2] is an effective and equitable desegregation plan within the constitutional guidelines that we have provided. The plan exhausts alternatives to two-way bussing, such as re-zoning and creation of satellites, and does not adhere to rigid racial ratios. Rather, the plan is flexible, as it permits variations derived by weighing the practicalities at hand and places into equitable balance the objectives sought and the results to be

1. The hearings extended from April 29 to June 27, 1975, consuming approximately nine weeks.

2. We have concluded that a desegregation plan must be implemented during the Winter

Term 1976. Time considerations will not permit another request for re-evaluation of the modifications mandated.

achieved. (Memo. Op., p. 87).[3] The plan recognizes the need to preserve walk-in schools in integrated neighborhoods, and contains the flexibility needed to encourage stability in integrated neighborhoods. The flexibility of the plan is further demonstrated by the fact that where reassignments are made at the elementary level, the students involved are assigned to a walk-in middle school or high school. Moreover, the plan provides for rotation of classes between paired schools to lessen or equalize the transportation burden (Memo. Op., pp. 91, 93). Most important, the plan avoids transportation serving no desegregative purpose, such as bussing black children long distances to attend predominantly black schools. The court is satisfied that wherever transportation of white or black children is ordered, it serves a desegregative purpose. Thus, the plan is sensitive to the educational aspirations of the children and parents of Detroit who are not themselves responsible for the invidious violations exposed during the liability phase of these hearings.

■ We do not mean to imply that the plan, even with the modifications made by the court, is perfect. Future events may well dictate that other selections are more desirable; practicalities will change. But we are confident that, with the continued guidance of the court, the Detroit Board will remain responsive to changing practicalities. We are reminded that, even after a finding of segregation, it is the affirmative duty of the local school board to repair the effects of segregation. We found the Detroit Board is willing to assume its constitutional duty to do so (Memo. Op., p. 65) and have taken into account that the "good faith conduct on the part of any litigant in any court, especially a court of equity, and more particularly, in the sensitive area of desegregation, is a

vital element for appropriate consideration." [Memo. Op., p. 120, quoting *Montgomery County Board of Education v. Carr*, 400 F.2d 1, 2 (5th Cir. 1968).] Once the Detroit Board has accepted its responsibility, the court's only remaining obligation is "to determine whether the structure designed by the school board will house a unitary system." (Memo. Op., p. 121.) We are confident that the Detroit Board will continue to seek an equitable balance of the essential "practicalities of the situation."

■ We have heretofore concluded that an appropriate plan must consider legitimate community concerns. Thus, it is constitutionally permissible for the Detroit Board to consider practicalities that truly exist and are not contrived to defeat desegregation. Such legitimate concerns deserving weight include the undesirability of forced student reassignments achieving only negligible desegregative results, the undesirability of bussing black children to predominantly black schools, the rapidly shifting population trends occurring naturally in the school district, the decrease in overall student enrollment coupled with the persistent increase in black student enrollment, the predominantly black racial ratio, the depressed economy of the community created by the highest rate of unemployment in the nation, and the financially crippled school district's inability to improve its financial position (Memo. Op., p. 4). The Detroit community is thus assured that the court's guidelines and the plan implemented pursuant thereto fully weigh all the "practicalities of the situation" and at the same time make "every effort to achieve the greatest possible degree of actual desegregation." *Davis v. School Comm'rs of Mobile County*, 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577 (1971).[4] We have been attentive to the

---

3. Our guidelines discard the use of rigid ratios in the desegregative effort. We suggest a 50–50 racial ratio as a starting point, but permit deviation therefrom depending upon the practicalities surrounding each individual school.

4. The plan tracks the court's guidelines as well as might be expected. The school authorities

transport approximately 22,000 students and provide walk-in schools for an additional 6,000 students. It is important to emphasize that the school district has always transported 14,000 students to relieve overcrowding and to avoid hazardous crossings. By more efficient use of the transportation already existing, the plan realizes a net gain of 8,000.

obvious need for residential stability (Memo. Op., p. 2). We have said and again emphasize that " . . . an effective and feasible remedy must prevent resegregation at all costs. . . . In a school district that is only 26% white,[5] a remedy that does not take account of the possibility of resegregation will be short-lived and useless if that percentage of whites further decreased." (Memo. Op., p. 4.)

We are fully aware of the community concern for the hardships involved in forced reassignments, particularly through the use of school bussing. This awareness influenced the court to scrutinize every school involved in the plan carefully to ascertain that the desegregative results achieved warranted the burdens imposed. For example, the court rejected the reassignment of students from the Grayling or Greenfield Union Schools, finding that, although each school was slightly under the 30% black figure that the court used to define a desegregated school, "[t]he presence of other minorities in significant numbers is a permissible practicality to be taken into account when deciding whether a school should be included in reassignment plan." Memorandum and Order of October 8, 1975, at p. 5. In another instance, the court objected to the pairing of the Beard and Wingert Schools because, even though substantial desegregation would result, we found it inequitable to pair Beard with a school as far away as Wingert while other schools adjacent to Beard (Higgins, Harms and Bennett) were paired with schools located much closer to their neighborhood. The court referred to its finding that "there should not be great variances in the transportation burden falling on adjacent areas because such variations will influence residential patterns." (Memo. Op., p. 92.) To further illustrate the close scrutiny the court gave to each aspect of the reassignment plan, we were able to eliminate much needless transportation in Region 7 by rejecting a Board proposal to convert the

Wayne Elementary School (92% white) to a middle school and transport Wayne students to Burbank School (97% white). We reminded the Detroit Board that "the bussing of white children to predominantly white schools . . . serves no desegregative purpose and is no less objectionable [than the bussing of black children to predominantly black schools]." Memo. and Order of October 8, 1975, at p. 5.

While some members of the community may be displeased over some of the reassignments the court has deemed essential, it is our hope that their burden will be made easier to bear by the knowledge that the court has given full consideration to every reassignment and has permitted the reassignment of students only where it has concluded that the desegregative results achieved justify the burdens imposed. Moreover, Detroit citizens can be further assured that the court has taken steps to improve the quality of education and has not permitted transfers where the receiving school is not comparable in all respects to the sending school. With assurances that the court and the Detroit Board have carefully weighed the practicalities, we are confident that the Detroit community will recognize that what is implemented today is constitutionally mandated. The citizens of Detroit know that the law must be obeyed.

We have said that a successful desegregative effort emphasizing quality education will require the cooperation and the support of the entire community. We know that Detroiters have always volunteered community support to advance worthwhile causes. We know of no greater cause than rejuvenating the vitality of the city's schools. A vibrant school system will assure stability for city and community alike. Having assured the Detroit community that the court has weighed the practicalities of the situation fully, we are confident that the plan will receive the cooperation and support of the entire community. When

---

5. The 1975 fourth Friday count discloses that this figure is now 23% white.

cooperation and support are granted freely, the plan will succeed. The support of the community will afford the Detroit school system an opportunity to make a fresh start. This support will enable the school system to fulfill the community aspirations for desegregated quality education for all children. It is our belief that the guidelines announced will create a unitary school system of which Detroit citizens can be proud. A quality school system will evolve that is concerned not with black children nor white children, but just children.

Accordingly, IT IS HEREBY ORDERED that the defendant Detroit Board of Education implement and cause to be implemented the desegregation plan on or before the beginning of the Winter Semester, 1976;

IT IS FURTHER ORDERED that the defendant Detroit Board of Education shall direct its Interim General Superintendent to formulate a program for the implementation of the desegregation plan, and that the defendant Detroit Board of Education shall submit to the court, on or before December 19, 1975, the program as formulated for the appropriate implementation;

IT IS FURTHER ORDERED that, pursuant to the October 2, 1975 order of the U.S. Sixth Circuit Court of Appeals, the parties hereto shall appear before this court on December 1, 1975, at 9:00 A.M., for an appropriate order concerning school closings proposed on pages 10–11 of the defendant Detroit Board of Education's submission of October 21, 1975.

## APPENDIX

The plan has been developed from the Detroit Board of Education's submissions of September 19 and October 21, 1975. We recognize that the successful implementation of a desegregation plan will require solutions to a variety of problems and that the rapidly shifting population trend may create new problems.

Because the school district reschedules classes each semester as a part of its regular practice, we do not see any difficulty in implementing the plan at the start of the winter semester at the lower grade level.[1] Moreover, since many high schools already enroll the ninth grade, we do not see many problems caused by the reassignment of ninth graders pursuant to the court's order to change junior high schools to grade 6–8 middle schools. However, desegregation of the high schools poses a number of problems not faced by elementary and middle schools. Since school programs become more specialized at higher grade levels, special provisions must be made for the phasing in of the plan at the high school level. Reassignments occurring during the school year may pose an especially difficult burden for high school students because of the possibility that the receiving high school will not have the same educational programs as the sending high school.

While there is no easy solution to the problem of desegregating the high schools, the Detroit Board may wish to consider a change in the method of high school assignments that will facilitate desegregation. While the Detroit Board makes assignments of students to high schools that are dependent upon middle school or junior high school assignments, many school districts structure high school attendance zones without regard to junior high school assignments. Such a method of assignment possesses greater flexibility and might be of aid to desegregation. The Detroit Board's present method of making high school assignments places unnecessary constraints on desegregation, and does not minimize student travel to high school. The Detroit Board may wish to consider making high school assignments on the basis of elementary attendance zones alone, with zones possibly being split where it proves advantageous for desegregation or convenience of students.

---

1. It is difficult to ascertain from the plan the precise pairing procedures employed. In Region 2, for example, we have designated schools where rotation pairing is appropriate (see p. 13 of the Plan).

This recommendation is particularly appropriate for Regions 4, 6 and 7. Moreover, where high school students are reassigned for desegregative purposes, fairness would require that they be provided transportation where they are assigned to a high school more than two miles from their residence.

The Detroit Board of Education should require that its staff review the attached plan in detail to assure that it is just and feasible. The responsibility remains with the Detroit Board to notify the court if features in the plan require revision because of changing practicalities. In that event, the Detroit Board should proceed by filing a petition for revision of any specific school assignment for the court's consideration.

Finally, the Detroit Board of Education shall establish and publicize an information center that is adequately equipped and staffed to provide a source for dispensing accurate information concerning the desegregation plan to the public and school community. In addition to responding to inquiries, the information center should have a mechanism for accepting suggestions and constructive criticism from parents and other members of the community.