MILLIKEN, GOVERNOR OF MICHIGAN, ET AL. *v.*
BRADLEY ET AL.

No. 76–447.   Argued March 22, 1977—Decided June 27, 1977

BURGER, C. J., delivered the opinion of the Court, in which BRENNAN, STEWART, WHITE, MARSHALL, BLACKMUN, REHNQUIST, and STEVENS, JJ., joined. MARSHALL, J., filed a concurring opinion, *post*, p. 291. POWELL, J., filed an opinion concurring in the judgment, *post*, p. 292.

*Frank J. Kelley,* Attorney General of Michigan, argued the cause for petitioners. With him on the briefs were *Robert A. Derengoski,* Solicitor General, and *Gerald F. Young, George L. McCargar,* and *Mary Kay Bottecelli,* Assistant Attorneys General.

*Nathaniel R. Jones* argued the cause for Bradley respondents. With him on the brief were *Paul R. Dimond, Louis R. Lucas, Robert A. Murphy, William E. Caldwell,* and *Richard S. Kohn. George T. Roumell, Jr.,* argued the cause for respondent Detroit Board of Education. With him on the brief were *Jane K. Souris* and *Thomas M. J. Hathaway.**

---

*Robert P. Kane,* Attorney General, and *Jeffrey Cooper* and *J. Justin Blewitt,* Deputy Attorneys General, filed a brief for the Commonwealth of Pennsylvania as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *Acting Solicitor General Friedman, Assistant Attorney General Days, Deputy Solicitor General Wallace, Brian K. Landsberg,* and *Judith E. Wolf* for the United

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari in this case to consider two questions concerning the remedial powers of federal district courts in school desegregation cases, namely, whether a District Court can, as part of a desegregation decree, order compensatory or remedial educational programs for schoolchildren who have been subjected to past acts of *de jure* segregation, and whether, consistent with the Eleventh Amendment, a federal court can require state officials found responsible for constitutional violations to bear part of the costs of those programs.

I

This case is before the Court for the second time, following our remand, *Milliken* v. *Bradley*, 418 U. S. 717 (1974) (*Milliken I*); it marks the culmination of seven years of litigation over *de jure* school segregation in the Detroit public school system. For almost six years, the litigation has focused exclusively on the appropriate remedy to correct official acts of racial discrimination committed by both the Detroit School Board and the State of Michigan. No challenge is now made by the State or the local school board to the prior findings of *de jure* segregation.[1]

States; and by *Herbert Teitelbaum, Robert Hermann,* and *Vilma Martinez* for Aspira of America, Inc., et al.

*John L. Hill,* Attorney General, *David M. Kendall,* First Assistant Attorney General, and *Thomas W. Choate,* Special Assistant Attorney General, filed a brief for the State of Texas as *amicus curiae.*

[1] The violations of the Detroit Board of Education, which included the improper use of optional attendance zones, racially based transportation of schoolchildren, improper creation and alteration of attendance zones, grade structures, and feeder school patterns, are described in the District Court's initial "Ruling on Issue of Segregation." 338 F. Supp. 582, 587–588 (ED Mich. 1971). The District Court further found that "[t]he State and its agencies . . . have acted directly to control and maintain the pattern of segregation in the Detroit schools." *Id.,* at 589. Indeed, when the Detroit School Board attempted to voluntarily

A

In the first stage of the remedy proceedings, which we reviewed in *Milliken I, supra,* the District Court, after reviewing several "Detroit-only" desegregation plans, concluded that an interdistrict plan was required to " 'achieve the greatest degree of actual desegregation . . . [so that] no school, grade or classroom [would be] substantially disproportionate to the overall pupil racial composition.' " 345 F. Supp. 914, 918 (ED Mich. 1972), quoted in *Milliken I, supra,* at 734. On those premises, the District Court ordered the parties to submit plans for "metropolitan desegregation" and appointed a nine-member panel to formulate a desegregation plan, which would encompass a "desegregation area" consisting of 54 school districts.

In June 1973, a divided Court of Appeals, sitting en banc, upheld, 484 F. 2d 215 (CA6), the District Court's determination that a metropolitanwide plan was essential to bring about what the District Court had described as "the greatest degree of actual desegregation . . . ." 345 F. Supp., at 918. We reversed, holding that the order exceeded appropriate limits of federal equitable authority as defined in *Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U. S. 1, 24 (1971), by concluding that "as a matter of substantive constitutional right, [a] particular degree of racial balance" is required, and by subjecting other school districts, uninvolved with and unaffected by any constitutional violations, to the court's remedial powers. *Milliken I, supra.* Proceeding from the *Swann* standard "that the scope of the remedy is determined by the nature and extent of the constitutional violation," we held that, on the record before us, there was no interdistrict viola-

---

initiate an intradistrict remedy to ameliorate the effect of the past segregation practices, the Michigan Legislature enacted a law forbidding the carrying out of this remedy. Those conclusions as to liability were affirmed on appeal, 484 F. 2d 215, 221–241 (CA6 1973), and were not challenged in this Court. 418 U. S. 717 (1974) (*Milliken I*).

tion calling for an interdistrict remedy. Because the District Court's "metropolitan remedy" went beyond the constitutional violation, we remanded the case for further proceedings "leading to prompt formulation of a decree directed to eliminating the segregation found to exist in the Detroit city schools, a remedy which has been delayed since 1970." 418 U. S., at 753.[2]

## B

Due to the intervening death of Judge Stephen J. Roth, who had presided over the litigation from the outset, the case on remand was reassigned to Judge Robert E. DeMascio. Judge DeMascio promptly ordered respondent Bradley and the Detroit Board to submit desegregation plans limited to the Detroit school system. On April 1, 1975, both parties submitted their proposed plans. Respondent Bradley's plan was limited solely to pupil reassignment; the proposal called for extensive transportation of students to achieve the plan's ultimate goal of assuring that every school within the district reflected, within 15 percentage points, the racial ratio of the school district as a whole.[3] In contrast to respondent Brad-

---

[2] Separate opinions were filed in *Milliken I*. MR. JUSTICE STEWART, concurring, stated that the metropolitanwide remedy contemplated by the District Court was "in error for the simple reason that the remedy . . . was not commensurate with the constitutional violation found." 418 U. S., at 754. Dissenting opinions were filed by Mr. Justice Douglas, MR. JUSTICE WHITE, and MR. JUSTICE MARSHALL. The dissenting opinions took the position, in brief, that the remedy was appropriate, given the State's undisputed constitutional violations, the control of local education by state authorities, and the manageability of any necessary administrative modifications to effectuate a metropolitanwide remedy.

[3] According to the then most recent statistical data, as of September 27, 1974, 257,396 students were enrolled in the Detroit public schools, a figure which reflected a decrease of 28,116 students in the system since the 1960–1961 school year. 402 F. Supp. 1096, 1106–1107 (1975). Of this total student population, 71.5% were Negro and 26.4% were white. The remaining 2.1% were composed of students of other ethnic groups. *Id.*, at 1106.

ley's proposal, the Detroit Board's plan provided for sufficient pupil reassignment to eliminate "racially identifiable white elementary schools," while ensuring that "every child will spend at least a portion of his education in either a neighborhood elementary school or a neighborhood junior and senior high school." 402 F. Supp. 1096, 1116 (1975). By eschewing racial ratios for each school, the Board's plan contemplated transportation of fewer students for shorter distances than respondent Bradley's proposal.[4]

In addition to student reassignments, the Board's plan called for implementation of 13 remedial or compensatory programs, referred to in the record as "educational components." These compensatory programs, which were proposed in addition to the plan's provisions for magnet schools and vocational high schools, included three of the four components at issue in this case—in-service training for teachers and administrators, guidance and counseling programs, and revised testing procedures.[5] Pursuant to the District Court's direction, the State Board of Education [6] on April 21, 1975,

---

[4] Under respondent Bradley's proposed plan in the remand proceedings, 71,349 students would have required transportation; the Detroit Board's plan, however, provided for transportation of 51,000 students, 20,000 less than the Bradley plan. The Board's plan, which the District Court found infirm because of an impermissible use of "arbitrary" racial quotas, contemplated achieving a 40%–60% representation of Negro students in the identifiably white schools, while leaving untouched in terms of pupil reassignment schools in three of the Detroit system's eight regions. Those three regions, which were located in the central city, were overwhelmingly Negro in racial composition.

[5] The fourth component, a remedial reading and communications skills program, was proposed later and was endorsed by the Bradley respondents in a critique of the Detroit Board's proposed plan. See n. 7, infra. The Board's plan also called for the following "educational components": school-community relations, parental involvement, student rights and responsibilities, accountability, curriculum design, bilingual education, multiethnic curriculum, and cocurricular activities. 402 F. Supp., at 1118.

[6] In addition to the State Board of Education, the state defendants

submitted a critique of the Detroit Board's desegregation plan; in its report, the State Board opined that, although "[i]t is possible that none of the thirteen 'quality education' components is essential . . . to correct the constitutional violation . . . ," 8 of the 13 proposed programs nonetheless deserved special consideration in the desegregation setting. Of particular relevance here, the State Board said:

> "Within the context of effectuating a pupil desegregation plan, the in-service training [and] guidance and counseling . . . components appear to deserve special emphasis." 4 Record, Doc. 591, pp. 38–39.[7]

After receiving the State Board's critique,[8] the District Court conducted extensive hearings on the two plans over a two-month period. Substantial testimony was adduced with respect to the proposed educational components, including testimony by petitioners' expert witnesses.[9] Based on this

----

include the Governor of Michigan, the Attorney General, the State Superintendent of Public Instruction, and the State Treasurer.

[7] Two months later, the Bradley respondents also submitted a critique of the Board's plan; while criticizing the Board's proposed educational components on several grounds, respondents nonetheless suggested that a remedial reading program was particularly needed in a desegregation plan. See n. 5, *supra*. The Bradley respondents claimed more generally that the Board's plan failed to inform the court of the then-current extent of such programs or components in the school system and that the plan failed to assess "the relatedness of the particular component to desegregation."

[8] The other state defendants likewise filed objections to the Detroit Board's plan on April 21, 1975. They contended, in brief, that the court's remedy was limited to pupil reassignment to achieve desegregation; hence, the proposed inclusion of educational components was, in their view, excessive.

[9] For example, Dr. Charles P. Kearney, Associate Superintendent for Research and School Administration for the Michigan Department of Education, gave the following testimony:

"[T]he State Board and the Superintendent indicated that guidance

evidence and on reports of court-appointed experts, the District Court on August 11, 1975, approved, in principle, the Detroit Board's inclusion of remedial and compensatory educational components in the desegregation plan.[10]

> "We find that the majority of the educational components included in the Detroit Board plan are essential for a school district undergoing desegregation. While it is true that the delivery of quality desegregated educational services is the obligation of the school board, nevertheless this court deems it essential to mandate educational components where they are needed to remedy effects of past segregation, to assure a successful desegregative effort and to minimize the possibility of resegregation." 402 F. Supp., at 1118.

The District Court expressly found that the two components of testing and counseling, as then administered in Detroit's

and counselling appeared to deserve special emphasis in a desegregation effort.

"We support the notion of a guidance and counselling effort. We think it certainly does have a relationship in the desegregation effort, we think it deserves special emphasis." 30 Record, Tr. 126, 129.

As to in-service training, Dr. Kearney testified that, in his opinion, such a program was required to implement effectively a desegregation plan in Detroit. *Id.*, at 179, 187. Finally, even though the State's critique did not deem testing as deserving of "special emphasis" in the desegregation plan, Dr. Kearney stated as follows:

"Q: [D]o you see a direct relationship between testing and desegregation?

"A: If test results were inappropriately used, . . . I think it would have certainly a discriminatory affect [*sic*] and it would have a negative affect [*sic*], I'm sure on any kind of desegregation plan being implemented." *Id.*, at 184.

[10] The District Court did not approve of all aspects of the Detroit Board's plan. With respect to educational components, the court said: "The plan as submitted . . . does not distinguish between those components that *are necessary to the successful implementation of a desegregation plan and those that are not.*" 402 F. Supp., at 1118. (Emphasis supplied.)

schools, were infected with the discriminatory bias of a segregated school system:

> "In a segregated setting many techniques deny equal protection to black students, such as discriminatory testing [and] discriminatory counseling . . . ." *Ibid.*

The District Court also found that, to make desegregation work, it was necessary to include remedial reading programs and in-service training for teachers and administrators:

> "In a system undergoing desegregation, teachers will require orientation and training for desegregation. . . . Additionally, we find that . . . comprehensive reading programs are essential . . . to a successful desegregative effort." *Ibid.*

Having established these general principles, the District Court formulated several "remedial guidelines" to govern the Detroit Board's development of a final plan. Declining "to substitute its authority for the authority of elected state and local officials to decide which educational components are beneficial to the school community," *id.*, at 1145, the District Judge laid down the following guidelines with respect to each of the four educational components at issue here:

(a) *Reading.* Concluding that "[t]here is no educational component more directly associated with the process of desegregation than reading," *id.*, at 1138, the District Court directed the General Superintendent of Detroit's schools to institute a remedial reading and communications skills program "[t]o eradicate the effects of past discrimination . . . ." *Ibid.* The content of the required program was not prescribed by the court; rather, formulation and implementation of the program was left to the Superintendent and to a committee to be selected by him.

(b) *In-Service Training.* The court also directed the Detroit Board to formulate a comprehensive in-service teacher

training program, an element "essential to a system undergoing desegregation." *Id.*, at 1139. In the District Court's view, an in-service training program for teachers and administrators, to train professional and instructional personnel to cope with the desegregation process in Detroit, would tend to ensure that all students in a desegregated system would be treated equally by teachers and administrators able, by virtue of special training, to cope with special problems presented by desegregation, and thereby facilitate Detroit's conversion to a unitary system.

(c) *Testing.* Because it found, based on record evidence, that Negro children "are especially affected by biased testing procedures," the District Court determined that, frequently, minority students in Detroit were adversely affected by discriminatory testing procedures. Unless the school system's tests were administered in a way "free from racial, ethnic and cultural bias," the District Court concluded that Negro children in Detroit might thereafter be impeded in their educational growth. *Id.*, at 1142. Accordingly, the court directed the Detroit Board and the State Department of Education to institute a testing program along the lines proposed by the local school board in its original desegregation plan. *Ibid.*

(d) *Counseling and Career Guidance.* Finally, the District Court addressed what expert witnesses had described as psychological pressures on Detroit's students in a system undergoing desegregation. Counselors were required, the court concluded, both to deal with the numerous problems and tensions arising in the change from Detroit's dual system, and, more concretely, to counsel students concerning the new vocational and technical school programs available under the plan through the cooperation of state and local officials.[11]

---

[11] In contrast to their position before the District Court with respect to the four educational components at issue here, the state defendants,

Nine months later, on May 11, 1976, the District Court entered its final order. Emphasizing that it had "been careful to order only what is essential for a school district undergoing desegregation," App. to Pet. for Cert. 117a, the court ordered the Detroit Board and the state defendants to institute comprehensive programs as to the four educational components by the start of the September 1976 school term. The cost of these four programs, the court concluded, was to be equally borne by the Detroit School Board and the State. To carry out this cost sharing, the court directed the local board to calculate its highest budget allocation in any prior year for the several educational programs and, from that base, any excess cost attributable to the desegregation plan was to be paid equally by the two groups of defendants responsible for prior constitutional violations, *i. e.*, the Detroit Board and the state defendants.

## C

On appeal, the Court of Appeals for the Sixth Circuit affirmed the District Court's order concerning the implementation of and cost sharing for the four educational components.[12] 540 F. 2d 229 (1976). The Court of Appeals ex-

---

through the State Board of Education, voluntarily entered into a stipulation with the Detroit Board on February 24, 1976, under which the State agreed to provide 50% of the construction costs of five vocational centers which the District Court ordered to be established. App. to Pet. for Cert. 139a–141a.

[12] The Court of Appeals disapproved, however, of the District Court's failure to include three of Detroit's eight regions in the pupil assignment plan. See n. 4, *supra*. The Court of Appeals remanded the case to the District Court for further consideration of the three omitted regions, but declined to set forth guidelines, given the practicabilities of the situation, for the District Court's benefit. Further proceedings were deemed appropriate, however, particularly since the Bradley respondents had previously been granted leave to file a second amended complaint to allege interdistrict violations on the part of the state and local defendants.

pressly approved the District Court's findings as to the necessity for these compensatory programs:

"This finding . . . is not clearly erroneous, but to the contrary is supported by ample evidence.

"The need for in-service training of the educational staff and development of nondiscriminatory testing is obvious. The former is needed to insure that the teachers and administrators will be able to work effectively in a desegregated environment. The latter is needed to insure that students are not evaluated unequally because of built-in bias in the tests administered in formerly segregated schools.

"We agree with the District Court that the reading and counseling programs are essential to the effort to combat the effects of segregation.

. . . . .

"Without the reading and counseling components, black students might be deprived of the motivation and achievement levels which the desegregation remedy is designed to accomplish." *Id.,* at 241.

After reviewing the record, the Court of Appeals confirmed that the District Court relied largely on the Detroit School Board in formulating the decree:

"This is not a situation where the District Court 'appears to have acted solely according to its own notions of good educational policy unrelated to the demands of the Constitution.'" *Id.,* at 241–242, quoting *Keyes* v. *School Dist. No. 1, Denver, Colo.,* 521 F. 2d 465, 483 (CA10 1975), cert. denied, 423 U. S. 1066 (1976).

After upholding the remedial-components portion of the plan, the Court of Appeals went on to affirm the District Court's allocation of costs between the state and local officials. Analyzing this Court's decision in *Edelman* v. *Jordan,* 415 U. S. 651 (1974), which reaffirmed the rule that the Eleventh

Amendment bars an ordinary suit for money damages against the State without its consent, the Court of Appeals held:

"[The District Court's order] imposes no money judgment on the State of Michigan for past de jure segregation practices. Rather, the order is directed toward the State defendants as a part of a *prospective* plan to comply with a constitutional requirement to eradicate all vestiges of de jure segregation." 540 F. 2d, at 245. (Emphasis supplied.)

The Court of Appeals remanded the case for further consideration of the three central city regions untouched by the District Court's pupil reassignment plan. See n. 12, *supra.*

The state defendants then sought review in this Court, challenging only those portions of the District Court's comprehensive remedial order dealing with the four educational components and with the State's obligation to defray the costs of those programs. We granted certiorari, 429 U. S. 958 (1976), and we affirm.

## II

This Court has not previously addressed directly the question whether federal courts can order remedial education programs as part of a school desegregation decree.[13] However, the general principles governing our resolution of this issue are well settled by the prior decisions of this Court. In the first case concerning federal courts' remedial powers in eliminating *de jure* school segregation, the Court laid down the basic rule which governs to this day: "In fashioning and

[13] In *Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U. S. 1 (1971), the Court affirmed an order of the District Court which included a requirement of in-service training programs. 318 F. Supp. 786, 803 (WDNC 1970). However, this Court's opinion did not treat the precise point. In *Keyes* v. *School Dist. No. 1, Denver, Colo.,* 413 U. S. 189 (1973), the Court expressly avoided passing on the District Court's holding that called for, among other things, "compensatory education in an integrated environment." *Id.,* at 214 n. 18.

effectuating the [desegregation] decrees, the courts will be guided by equitable principles." *Brown* v. *Board of Education,* 349 U. S. 294, 300 (1955) (*Brown II*).

## A

Application of those "equitable principles," we have held, requires federal courts to focus upon three factors. In the first place, like other equitable remedies, the nature of the desegregation remedy is to be determined by the nature and scope of the constitutional violation. *Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U. S., at 16. The remedy must therefore be related to "the *condition* alleged to offend the Constitution . . . ." *Milliken I,* 418 U. S., at 738.[14] Second, the decree must indeed be *remedial* in nature, that is, it must be designed as nearly as possible "to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct." *Id.,* at 746.[15] Third, the federal courts in devising a remedy must

[14] Thus, the Court has consistently held that the Constitution is not violated by racial imbalance in the schools, without more. *Pasadena Bd. of Education* v. *Spangler,* 427 U. S. 424, 434 (1976); *Milliken I,* 418 U. S., at 763 (WHITE, J., dissenting); *Swann, supra,* at 26. An order contemplating the " 'substantive constitutional right [to a] particular degree of racial balance or mixing' " is therefore infirm as a matter of law. *Spangler, supra,* at 434.

[15] Since the ultimate objective of the remedy is to make whole the victims of unlawful conduct, federal courts are authorized to implement plans that promise "realistically to work *now.*" *Green* v. *County School Bd.,* 391 U. S. 430, 439 (1968). At the same time, the Court has carefully stated that, to ensure that federal-court decrees are characterized by the flexibility and sensitivity required of equitable decrees, consideration must be given to burdensome effects resulting from a decree that could "either risk the health of the children or significantly impinge on the educational process." *Swann, supra,* at 30–31. Our function, as stated by MR. JUSTICE WHITE, is "to desegregate an *educational* system in which the races have been kept apart, without, at the same time, losing sight of the central *educational* function of the schools." *Milliken I, supra,* at 764 (dissenting opinion). (Emphasis in original.) In a word,

take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution. In *Brown II* the Court squarely held that "[s]chool authorities have the *primary* responsibility for elucidating, assessing, and solving these problems . . . ." 349 U. S., at 299. (Emphasis supplied.) If, however, "school authorities fail in their affirmative obligations . . . judicial authority may be invoked." *Swann, supra,* at 15. Once invoked, "the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Ibid.*

## B

In challenging the order before us, petitioners do not specifically question that the District Court's mandated programs are designed, as nearly as practicable, to restore the schoolchildren of Detroit to the position they would have enjoyed absent constitutional violations by state and local officials. And, petitioners do not contend, nor could they, that the prerogatives of the Detroit School Board have been abrogated by the decree, since of course the Detroit School Board itself proposed incorporation of these programs in the first place. Petitioners' sole contention is that, under *Swann,* the District Court's order exceeds the scope of the constitutional violation. Invoking our holding in *Milliken I,* petitioners claim that, since the constitutional violation found by the District Court was the unlawful segregation of students on the basis of race, the court's decree must be limited to remedying unlawful pupil assignments. This contention misconceives the principle petitioners seek to invoke, and we reject their argument.

The well-settled principle that the nature and scope of

---

"[t]here are undoubted practical as well as legal limits to the remedial powers of federal courts in school desegregation cases." 418 U. S., at 763. Cf. *Austin Independent School Dist.* v. *United States,* 429 U. S. 990, 991 (1976) (POWELL, J., concurring).

the remedy are to be determined by the violation means simply that federal-court decrees must directly address and relate to the constitutional violation itself. Because of this inherent limitation upon federal judicial authority, federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate the Constitution or does not flow from such a violation, see *Pasadena Bd. of Education* v. *Spangler,* 427 U. S. 424 (1976), or if they are imposed upon governmental units that were neither involved in nor affected by the constitutional violation, as in *Milliken I, supra. Hills* v. *Gautreaux,* 425 U. S. 284, 292–296 (1976). But where, as here, a constitutional violation has been found, the remedy does not "exceed" the violation if the remedy is tailored to cure the " '*condition* that offends the Constitution.' " *Milliken I, supra,* at 738. (Emphasis supplied.)

The "condition" offending the Constitution is Detroit's *de jure* segregated school system, which was so pervasively and persistently segregated that the District Court found that the need for the educational components flowed directly from constitutional violations by both state and local officials. These specific educational remedies, although normally left to the discretion of the elected school board and professional educators, were deemed necessary to restore the victims of discriminatory conduct to the position they would have enjoyed in terms of education had these four components been provided in a nondiscriminatory manner in a school system free from pervasive *de jure* racial segregation.

In the first case invalidating a *de jure* system, a unanimous Court, speaking through Mr. Chief Justice Warren, held in *Brown* v. *Board of Education,* 347 U. S. 483, 495 (1954) (*Brown I*): "Separate educational facilities are inherently unequal." And in *United States* v. *Montgomery County Bd. of Educ.,* 395 U. S. 225 (1969), the Court concerned itself not with pupil assignment, but with the desegregation of faculty and staff as part of the process of dismantling a dual

system. In doing so, the Court, there speaking through Mr. Justice Black, focused on the reason for judicial concerns going beyond pupil assignment: "The dispute . . . deals with faculty and staff desegregation, a goal that we have recognized to be an important aspect of *the basic task of achieving a public school system wholly free from racial discrimination.*" *Id.*, at 231–232. (Emphasis supplied.)

*Montgomery County* therefore stands firmly for the proposition that matters other than pupil assignment must on occasion be addressed by federal courts to eliminate the effects of prior segregation. Similarly, in *Swann* we reaffirmed the principle laid down in *Green v. County School Bd.,* 391 U. S. 430 (1968), that "existing policy and practice with regard to faculty, staff, transportation, extracurricular activities, and facilities were among the most important indicia of a segregated system." 402 U. S., at 18. In a word, discriminatory student assignment policies can themselves manifest and breed other inequalities built into a dual system founded on racial discrimination. Federal courts need not, and cannot, close their eyes to inequalities, shown by the record, which flow from a longstanding segregated system.

## C

In light of the mandate of *Brown I* and *Brown II,* federal courts have, over the years, often required the inclusion of remedial programs in desegregation plans to overcome the inequalities inherent in dual school systems. In 1966, for example, the District Court for the District of South Carolina directed the inclusion of remedial courses to overcome the effects of a segregated system:

"Because the weaknesses of a dual school system may have already affected many children, the court would be remiss in its duty if any desegregation plan were approved which did not provide for remedial education courses. They shall be included in the plan." *Miller* v. *School*

*District 2, Clarendon County, S. C.,* 256 F. Supp. 370, 377 (1966).

In 1967, the Court of Appeals for the Fifth Circuit, then engaged in overseeing the desegregation of numerous school districts in the South, laid down the following requirement in an en banc decision:

"The defendants shall provide remedial education programs which permit students attending or who have previously attended segregated schools *to overcome past inadequacies* in their education." *United States* v. *Jefferson County Board of Education,* 380 F. 2d 385, 394, cert. denied, 389 U. S. 840 (1967). (Emphasis supplied.)

See also *Stell* v. *Board of Public Education of Savannah,* 387 F. 2d 486, 492, 496–497 (CA5 1967); *Hill* v. *Lafourche Parish School Board,* 291 F. Supp. 819, 823 (ED La. 1967); *Redman* v. *Terrebonne Parish School Board,* 293 F. Supp. 376, 379 (ED La. 1967); *Lee* v. *Macon County Board of Education,* 267 F. Supp. 458, 489 (MD Ala. 1967); *Graves* v. *Walton County Board of Education,* 300 F. Supp. 188, 200 (MD Ga. 1968), aff'd, 410 F. 2d 1153 (CA5 1969). Two years later, the Fifth Circuit again adhered to the rule that district courts could properly seek to overcome the built-in inadequacies of a segregated educational system:

"The trial court concluded that the school board must establish remedial programs to assist students who previously attended all-Negro schools when those students transfer to formerly all-white schools . . . . The *remedial programs . . . are an integral part of a program for compensatory education to be provided Negro students who have long been disadvantaged* by the inequities and discrimination inherent in the dual school system. The requirement that the School Board institute remedial programs so far as they are feasible is a proper exercise of the court's discretion." *Plaquemines Parish School Bd.* v.

*United States,* 415 F. 2d 817, 831 (1969). (Emphasis supplied.)

In the same year the United States District Court for the Eastern District of Louisiana required school authorities to come forward with a remedial educational program as part of a desegregation plan. " 'The defendants shall provide remedial education programs which permit students . . . who have previously attended all-Negro schools to overcome past inadequacies in their education.' " *Smith* v. *St. Tammany Parish School Board,* 302 F. Supp. 106, 110 (1969), aff'd, 448 F. 2d 414 (CA5 1971). See also *Moore* v. *Tangipahoa Parish School Board,* 304 F. Supp. 244, 253 (ED La. 1969) ; *Moses* v. *Washington Parish School Board,* 302 F. Supp. 362, 367 (ED La. 1969).

In the 1970's, the pattern has been essentially the same. The Fifth Circuit has, when the fact situation warranted, continued to call for remedial education programs in desegregation plans. *E. g., United States* v. *Texas,* 447 F. 2d 441, 448 (1971), stay denied *sub nom. Edgar* v. *United States,* 404 U. S. 1206 (1971) (Black, J., in chambers). To that end, the approved plan in *United States* v. *Texas* required:

> "[C]urriculum offerings and programs shall include specific educational programs designed to compensate minority group children for unequal educational opportunities resulting from past or present racial and ethnic isolation . . . ." 447 F. 2d, at 448.[16]

See also *George* v. *O'Kelly,* 448 F. 2d 148, 150 (CA5 1971). And, as school desegregation litigation emerged in other

---

[16] In denying the stay application, Mr. Justice Black was untroubled by the underlying order of the District Court:

"It would be very difficult for me to suspend the order of the District Court that, in my view, does no more than endeavor to realize the directive of the Fourteenth Amendment and the decisions of this Court that racial discrimination in the public schools must be eliminated root and branch." 404 U. S., at 1207.

regions of the country, federal courts have likewise looked in part to remedial programs, when the record supported an order to that effect. See, *e. g., Morgan* v. *Kerrigan,* 401 F. Supp. 216, 235 (Mass. 1975), aff'd, 530 F. 2d 401 (CA1), cert. denied *sub nom. White* v. *Morgan,* 426 U. S. 935 (1976); *Hart* v. *Community School Board of Brooklyn,* 383 F. Supp. 699, 757 (EDNY 1974), aff'd, 512 F. 2d 37 (CA2 1975); cf. *Booker* v. *Special School Dist. 1, Minneapolis, Minn.,* 351 F. Supp. 799 (Minn. 1972).[17]

Finally, in addition to other remedial programs, which could, if circumstances warranted, include programs to remedy deficiencies, particularly in reading and communications skills, federal courts have expressly ordered special in-service training for teachers, see, *e. g., United States* v. *Missouri,* 523 F. 2d 885, 887 (CA8 1975); *Smith* v. *St. Tammany Parish School Board, supra,* at 110; *Moore* v. *Tangipahoa Parish School Board, supra,* at 253, and have altered or even suspended testing programs employed by school systems undergoing desegregation. See, *e. g., Singleton* v. *Jackson Municipal Separate School Dist.,* 419 F. 2d 1211, 1219 (CA5 1969), cert. denied, 396 U. S. 1032 (1970); *Lemon* v. *Bossier Parish School Board,* 444 F. 2d 1400, 1401 (CA5 1971); *Arvizu* v. *Waco Independent School Dist.,* 373 F. Supp. 1264 (WD Tex. 1973), rev'd in part on other issues, 495 F. 2d 499 (CA5 1974).

Our reference to these cases is not to be taken as necessarily approving holdings not reviewed by this Court. However, they demonstrate that the District Court in the case now

---

[17] We do not, of course, pass upon the correctness of the particular holdings of cases we did not review. We simply note that these holdings support the broader proposition that, when the record warrants, remedial programs may, in the exercise of equitable discretion, be appropriate remedies to treat the condition that offends the Constitution. Of course, it must always be shown that the constitutional violation caused the condition for which remedial programs are mandated.

before us did not break new ground in approving the School Board's proposed plan. Quite the contrary, acting on abundant evidence in this record, the District Court approved a remedial plan going beyond mere pupil assignments, as expressly approved by *Swann* and *Montgomery County*. In so doing, the District Court was adopting specific programs proposed by local school authorities, who must be presumed to be familiar with the problems and the needs of a system undergoing desegregation.[18]

We do not, of course, imply that the order here is a blueprint for other cases. That cannot be; in school desegregation cases, "[t]here is no universal answer to complex problems . . . ; there is obviously no one plan that will do the job in every case." *Green,* 391 U. S., at 439. On this record, however, we are bound to conclude that the decree before us was aptly tailored to remedy the consequences of the constitutional violation. Children who have been thus educationally and culturally set apart from the larger community will inevitably acquire habits of speech, conduct, and attitudes reflecting their cultural isolation. They are likely to acquire speech habits, for example, which vary from the environment in which they must ultimately function and compete, if they are to enter and be a part of that community. This is not peculiar to race; in this setting, it can affect any children who, as a group, are isolated by force of law from the mainstream. Cf. *Lau* v. *Nichols,* 414 U. S. 563 (1974).

Pupil assignment alone does not automatically remedy the impact of previous, unlawful educational isolation; the consequences linger and can be dealt with only by inde-

---

[18] This Court has from the beginning looked to the District Courts in desegregation cases, familiar as they are with the local situations coming before them, to appraise the efforts of local school authorities to carry out their constitutionally required duties. "Because of their proximity to local conditions . . . the [federal district] courts which originally heard these cases can best perform this judicial appraisal." *Brown II,* 349 U. S., at 299.

pendent measures. In short, speech habits acquired in a segregated system do not vanish simply by moving the child to a desegregated school. The root condition shown by this record must be treated directly by special training at the hands of teachers prepared for that task. This is what the District Judge in the case drew from the record before him as to the consequences of Detroit's *de jure* system, and we cannot conclude that the remedies decreed exceeded the scope of the violations found.

Nor do we find any other reason to believe that the broad and flexible equity powers of the court were abused in this case. The established role of local school authorities was maintained inviolate, and the remedy is indeed remedial. The order does not punish anyone, nor does it impair or jeopardize the educational system in Detroit.[19] The District Court, in short, was true to the principle laid down in *Brown II*:

> "In fashioning and effectuating the decrees, the courts will be guided by equitable principles. Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs. These cases call for the exercise of these traditional attributes of equity power." 349 U. S., at 300 (footnotes omitted).

### III

Petitioners also contend that the District Court's order, even if otherwise proper, violates the Eleventh Amendment. In their view, the requirement that the state defendants pay one-half the additional costs attributable to the four educa-

---

[19] Indeed, the District Judge took great pains to devise a workable plan with a minimum of pupil transportation. For example, he sought carefully to eliminate burdensome transportation of Negro children to predominantly Negro schools and to prevent the disruption, by massive pupil reassignment, of racially mixed schools in stable neighborhoods which had successfully undergone residential and educational change.

tional components is, "in practical effect, indistinguishable from an award of money damages against the state based upon the asserted prior misconduct of state officials." Brief for Petitioners 34. Arguing from this premise, petitioners conclude that the "award" in this case is barred under this Court's holding in *Edelman* v. *Jordan*, 415 U. S. 651 (1974).

*Edelman* involved a suit for money damages against the State, as well as for prospective injunctive relief.[20] The suit was brought by an individual who claimed that Illinois officials had improperly withheld disability benefit payments from him and from the members of his class. Applying traditional Eleventh Amendment principles, we held that the suit was barred to the extent the suit sought "the award of an *accrued* monetary liability . . ." which represented "retroactive payments." *Id.*, at 663–664. (Emphasis supplied.) Conversely, the Court held that the suit was proper to the extent it sought "payment of state funds . . . as a necessary consequence of compliance *in the future* with a substantive federal-question determination . . . ." *Id.*, at 668. (Emphasis supplied.)

The decree to share the future costs of educational components in this case fits squarely within the prospective-compliance exception reaffirmed by *Edelman*. That exception, which had its genesis in *Ex parte Young*, 209 U. S. 123 (1908), permits federal courts to enjoin state officials to conform their conduct to requirements of federal law, notwithstanding a direct and substantial impact on the state treasury. 415 U. S., at 667. The order challenged here does no more than that. The decree requires state officials, held responsible for unconstitutional conduct, in findings which are not challenged, to eliminate a *de jure* segregated school system. More precisely, the burden of state officials is that set forth

---

[20] Although the complaint in *Edelman* ostensibly sought only equitable relief, the plaintiff expressly requested " 'a permanent injunction enjoining the defendants to award to the entire class of plaintiffs all [disability] benefits wrongfully withheld.' " 415 U. S., at 656.

in *Swann*—to take the necessary steps "to eliminate from the public schools all vestiges of state-imposed segregation." 402 U. S., at 15. The educational components, which the District Court ordered into effect *prospectively*, are plainly designed to wipe out continuing conditions of inequality produced by the inherently unequal dual school system long maintained by Detroit.[21]

These programs were not, and as a practical matter could not be, intended to wipe the slate clean by one bold stroke, as could a retroactive award of money in *Edelman*.[22] Rather, by the nature of the antecedent violation, which on this record caused significant deficiencies in communications skills—reading and speaking—the victims of Detroit's *de jure* segregated system will continue to experience the effects of segregation until such future time as the remedial programs can help dissipate the continuing effects of past misconduct. Reading and speech deficiencies cannot be eliminated by judicial fiat; they will require time, patience, and the skills of specially trained teachers. That the programs are also "compensatory" in nature does not change the fact that they are part of a plan that operates *prospectively* to bring about the delayed benefits of a unitary school system. We therefore hold that such prospective relief is not barred by the Eleventh Amendment.[23]

---

[21] Unlike the award in *Edelman*, the injunction entered here could not instantaneously restore the victims of unlawful conduct to their rightful condition. Thus, the injunction here looks to the future, not simply to presently compensating victims for conduct and consequences completed in the past.

[22] In contrast to *Edelman*, there was no money award here in favor of respondent Bradley or any members of his class. This case simply does not involve individual citizens' conducting a raid on the state treasury for an accrued monetary liability. The order here is wholly prospective in the same manner that the decree mandates vocational schools and assignments, for example.

[23] Because of our conclusion, we do not reach either of the two alternative arguments in support of the District Court's judgment, namely,

Finally, there is no merit to petitioners' claims that the relief ordered here violates the Tenth Amendment and general principles of federalism. The Tenth Amendment's reservation of nondelegated powers to the States is not implicated by a federal-court judgment enforcing the express prohibitions of unlawful state conduct enacted by the Fourteenth Amendment. Cf. *Fitzpatrick* v. *Bitzer,* 427 U. S. 445 (1976). Nor are principles of federalism abrogated by the decree. The District Court has neither attempted to restructure local governmental entities nor to mandate a particular method or structure of state or local financing. Cf. *San Antonio School Dist.* v. *Rodriguez,* 411 U. S. 1 (1973). The District Court has, rather, properly enforced the guarantees of the Fourteenth Amendment consistent with our prior holdings, and in a manner that does not jeopardize the integrity of the structure or functions of state and local government.

The judgment of the Court of Appeals is therefore

*Affirmed.*

Mr. Justice Marshall, concurring.

I wholeheartedly join The Chief Justice's opinion for the Court. My Brother Powell's opinion prompts these additional comments.

What is, to me, most tragic about this case is that in all relevant respects it is in no way unique. That a northern school board has been found guilty of intentionally discriminatory acts is, unfortunately, not unusual. That the academic development of black children has been impaired by this wrongdoing is to be expected. And, therefore, that a program

---

that the State of Michigan expressly waived its Eleventh Amendment immunity by virtue of Mich. Stat. Ann. § 15.1023 (7) (1975), and that the Fourteenth Amendment, *ex proprio vigore,* works a *pro tanto* repeal of the Eleventh Amendment. Cf. *Fitzpatrick* v. *Bitzer,* 427 U. S. 445 (1976). Neither question was addressed by the Court of Appeals, and we therefore do not pass on either issue.

of remediation is necessary to supplement the primary remedy of pupil reassignment is inevitable.

It is of course true, as MR. JUSTICE POWELL notes, that the Detroit School Board has belatedly recognized its responsibility for the injuries that Negroes have suffered, and has joined in the effort to remedy them. He may be right—although I hope not—that this makes the case "wholly different from any prior case," *post,* this page. But I think it worth noting that the legal issues would be no different if the Detroit School Board came to this Court on the other side. The question before us still would be the one posed by the State: Is the remedy tailored to fit the scope of the violation? And, as THE CHIEF JUSTICE convincingly demonstrates, that question would have to be answered in the affirmative in light of the findings of the District Court, supported by abundant evidence. Cf. *Dayton Board of Education* v. *Brinkman, post,* at 414.

MR. JUSTICE POWELL, concurring in the judgment.

The Court's opinion addresses this case as if it were conventional desegregation litigation. The wide-ranging opinion reiterates the familiar general principles drawn from the line of precedents commencing with *Brown* v. *Board of Education,* 347 U. S. 483 (1954), and including today's decision in *Dayton Board of Education* v. *Brinkman, post,* p. 406. One has to read the opinion closely to understand that the case, as it finally reaches us, is wholly different from any prior case. I write to emphasize its uniqueness, and the consequent limited precedential effect of much of the Court's opinion.

Normally, the plaintiffs in this type of litigation are students, parents, and supporting organizations that desire to desegregate a school system alleged to be the product, in whole or in part, of *de jure* segregative action by the public school authorities. The principal defendant is usually the

local board of education or school board. Occasionally the state board of education and state officials are joined as defendants. This protracted litigation commenced in 1970 in this conventional mold. In the intervening years, however, the posture of the litigation has changed so drastically as to leave it largely a friendly suit between the plaintiffs (respondents Bradley et al.) and the original principal defendant, the Detroit School Board. These parties, antagonistic for years, have now joined forces apparently for the purpose of extracting funds from the state treasury. As between the original principal parties—the plaintiffs and the Detroit School Board—no case or controversy remains on the issues now before us. The Board enthusiastically supports the entire desegregation decree even though the decree intrudes deeply on the Board's own decisionmaking powers. Indeed, the present School Board *proposed* most of the educational components included in the District Court's decree. The plaintiffs originally favored a desegregation plan that would have required more extensive transportation of pupils, and they did not initially propose or endorse the educational components. In this Court, however, the plaintiffs also support the decree of the District Court as affirmed by the Court of Appeals.[1]

Thus the only complaining party is the State of Michigan (acting through state officials) and its basic complaint concerns *money,* not desegregation. It has been ordered to pay about $5,800,000 to the Detroit School Board. This is one-half the estimated "excess cost" of 4 of the 11 educational components

---

[1] Until the case reached this Court the plaintiffs apparently did not view the educational components as necessary or even important elements of a desegregation plan. These components were not included in plans submitted by the plaintiffs, and in briefs filed below there were indications that the plaintiffs viewed some—if not all—of these components as being "wholly unrelated to desegregation of students and faculty in schools." Brief for Plaintiffs-Appellants 5 n. 6 in the Court of Appeals, No. 75–2018 (filed Dec. 29, 1975).

294

included in the desegregation decree: remedial reading, in-service training of teachers, testing, and counseling.[2] The State, understandably anxious to preserve the state budget from federal-court control or interference, now contests the decree on two grounds.

[2] In addition to these four components, there were some seven other educational directives that are not contested here. (The details are set forth in the opinions and decrees of August 15, 1975, November 4 and 20, 1975, and May 11, 1976, all of which are reproduced in full in the appendix to the petition for certiorari. The first two such opinions also have been published. 402 F. Supp. 1096; 411 F. Supp. 943.) Perhaps the most expansive component was the District Court's order that the city and state boards create five vocational centers "devoted to in-depth occupational preparation in the construction trades, transportation and health services." 402 F. Supp., at 1140. As noted in the text, *infra,* at 296, a compromise was reached as to these centers and the State entered into a stipulation obligating it to share the cost of providing them. See App. to Pet. for Cert. 139a–144a. The other educational components ordered by the District Court included: (i) "two new technical high schools in which business education will be the central part of the curriculum," App. 75a; (ii) a new curriculum for the vocational education courses in the Detroit schools, including the requirement that an additional "grade 13" be added to afford expanded educational opportunities, 402 F. Supp., at 1140; (iii) the inclusion of "multi-ethnic studies" in the curriculum, with a request for federal funds to support "in-service training for teachers involved in such programs," *id.,* at 1144, App. to Pet. for Cert. 147a; (iv) a "Uniform Code of Conduct," which the Board was ordered to develop pursuant to guidelines established by the court, 402 F. Supp., at 1142, App. to Pet. for Cert. 148a; (v) a specific plan for "cocurricular activities" with other artistic and educational institutions in the area, to be developed by the Board and submitted for court approval, 402 F. Supp., at 1143; and (vi) a "community relations program" prescribed in remarkable detail by the court. *Ibid.,* App. to Pet. for Cert. 131a–135a.

In most, if not all, instances the court ordered that each of these programs be "comprehensive," and that reports be made to the court. One may doubt whether there is any precedent for a federal court's exercising such extensive control over the purely educational responsibilities of a school board.

First, it is argued that the order to pay state funds violates the Eleventh Amendment and principles of federalism. Ordinarily a federal court's order that a State pay unappropriated funds to a locality would raise the gravest constitutional issues. See generally *San Antonio School Dist.* v. *Rodriguez,* 411 U. S. 1, 40–42 (1973); *National League of Cities* v. *Usery,* 426 U. S. 833 (1976). But here, in a finding no longer subject to review, the State has been adjudged a participant in the constitutional violations, and the State therefore may be ordered to participate prospectively in a remedy otherwise appropriate.

The State's second argument is one that normally would be advanced vigorously by the school board. Relying on the established principle that the scope of the remedy in a desegregation case is determined and limited by the extent of the identified constitutional violations, *Dayton Board of Education, post,* at 419–420; *Hills* v. *Gautreaux,* 425 U. S. 284, 293–294 (1976); *Milliken* v. *Bradley,* 418 U. S. 717, 744 (1974); *Austin Independent School Dist.* v. *United States,* 429 U. S. 990, 991 (1976) (POWELL, J., concurring), the State argues that the District Court erred in ordering the system-wide expansion of the four educational components mentioned above. It contends that there has been no finding of a constitutional violation with respect to the past operation of any of these programs, and it insists that without more specifically focused findings of this sort, the decree exceeded the court's powers.

This argument is by no means a frivolous one. But the context in which it is presented is so unusual that it would be appropriate to dismiss the writ as improvidently granted. The argument is advanced by the State and not by the party primarily concerned. The educational programs at issue are standard and widely approved in public education. The State Board normally would be enthusiastic over enhancement of these programs so long as the local school board could

fund them without requiring financial aid from the State. It is equally evident that the State probably would resist a federal-court order requiring it to pay unappropriated state funds to the local school board regardless of whether violations by the local board justified the remedy. The State's interest in protecting its own budget—limited by legislative appropriations—is a genuine one. But it is not an interest that is related, except fortuitously, to a claim that the desegregation remedy may have exceeded the extent of the violations.

The State's reliance on the remedy issue contains a further weakness, emphasizing the unusual character of this case. There is no indication that the State objected—certainly, it does not object here—to the inclusion in the District Court's decree of the seven other educational components. See n. 2, *supra*. Indeed, the State expressly agreed to one of the most expensive components, the establishment of *vocational education centers, in a stipulation obligating it to* share the cost of construction equally with the Detroit Board. See App. to Pet. for Cert. 139a–144a. Furthermore, the District Court's decree largely embodies the original recommendation of the Detroit Board. Since local school boards "have the primary responsibility for elucidating, assessing, and solving [the] problems" generated by "[f]ull implementation of . . . constitutional principles" in the local setting, *Brown* v. *Board of Education,* 349 U. S. 294, 299 (1955), the State's limited challenge here is particularly lacking in force.

Moreover, the District Court was faced with a school district in exceptional disarray. It found the structure of the Detroit school system "chaotic and incapable of effective administration." App. to Pet. for Cert. 124a. The "general superintendent has little direct authority." *Ibid.* Each of the eight regional boards may be preoccupied with "distribut[ing] local board patronage." *Id.,* at 125a. The "local boards have diverted resources that would otherwise have been

available for educational purposes to build new offices and other facilities to house this administrative overload." *Ibid.* The District Court continued:

> "In addition to the administrative chaos, we know of no other school system that is so enmeshed in politics. . . .
>
> ". . . Rather than devoting themselves to the educa-tional system and the desegregative process, board members are busily engaged in politics not only to assure their own re-election but also to defeat others with whom they disagree." *Id.,* at 125a–126a (footnote omitted).

Referring again to the "political paralysis" and "inefficient bureaucracy" of the system, the court also noted—discouragingly—that the election then approaching "may well [result in] a board of education consisting of members possessing no experience in education." *Id.,* at 126a. In this quite remarkable situation, it is perhaps not surprising that the District Court virtually assumed the role of school superintendent and school board.[3]

___

[3] It merits emphasizing that the School Board invited this assumption of power. Indeed, the District Court had complimented the Board on its willingness to "implement any desegregation order the court may issue." 402 F. Supp., at 1125. But at one point there were serious second thoughts. In its brief in the Court of Appeals, the Board expressed grave concern as to what the District Court's assumption of the Board's powers could do to the school system financially:

"[O]n May 11, 1976 . . . the District Court ordered equalization of all school facilities and buildings preparatory to the 1976–77 school term; continuance of the comprehensive construction and renovation program; [and implementation of the educational components summarized in n. 2, *supra*]. . . .

"*Even without actual dollar figures, the financial impact of these orders could easily destroy the educational program of the Detroit school system.* The financing of these components by the Detroit school system would only mean a concomitant elimination of existing programs.

"It is virtually impossible for the Detroit Board of Education to re-order its priorities when it is already operating on a woefully inadequate budget that cannot provide a minimal quality educational program. *Any attempt*

Given the foregoing unique circumstances, it seems to me that the proper disposition of this case is to dismiss the writ of certiorari as improvidently granted. But as the Court has chosen to decide the case here, I join in the judgment as a result less likely to prolong the disruption of education in Detroit than a reversal or remand. Despite wide-ranging dicta in the Court's opinion, the only issue decided is that the District Court's findings as to specific constitutional violations justified the four remedial educational components included in the desegregation decree. In my view, it is at least arguable that the findings in this respect were too generalized to meet the standards prescribed by this Court. See *Dayton Board of Education, post,* p. 406. But the majority views the record as justifying the conclusion that "the need for educational components flowed directly from constitutional violations by both state and local officials." *Ante,* at 282.[4] On that view of the record, our settled doctrine requiring that the remedy be carefully tailored to fit identified constitutional violations is reaffirmed by today's result. I therefore concur in the judgment.

---

*to redistribute available resources will cause further deterioration in ongoing educational programs and will merely result in robbing Peter to pay Paul.*" Reprinted in the Appendix to the opinion of the Court of Appeals, 540 F. 2d 229, 250–251 (CA6) (emphasis added).

To say the least, the financial impact of the court's decree was profoundly disturbing. But apparently the financially pressed Board was willing to surrender a substantial portion of its decisionmaking authority in return for the prospect of enhanced state funding. For by the time it made this statement to the Court of Appeals, the Board knew that the District Court had exercised its power to do what the state legislature had chosen not to do: appropriate funds from the state treasury for these particular programs of the Detroit schools.

[4] The Court's opinion states, for example, that the District Court "expressly found that the two components of testing and counseling, as then administered in Detroit's schools, were infected with the discriminatory bias of a segregated school system." *Ante,* at 274–275.